40 A.3d 684

IN RE CONTEST OF NOVEMBER 8, 2011 GENERAL ELECTION
OF OFFICE OF NEW JERSEY GENERAL ASSEMBLY,
FOURTH LEGISLATIVE DISTRICT.

Argued January 27, 2012—Decided February 16, 2012.

30

Rabner, C.J., dissented and filed opinion in which Long and Albin, JJ., joined.

———

*William M. Tambussi* argued the cause for appellant/cross-respondent Gabriela Mosquera (*Brown & Connery,* attorneys; *Mr. Tambussi, William F. Cook, Christopher A. Orlando,* and *Michael J. Miles,* on the briefs).

*Matthew S. Wolf* argued the cause for respondent/cross-appellant Shelley Lovett (*Pappas & Wolf,* attorneys).

*Donna Kelly,* Assistant Attorney General, argued the cause for respondents Attorney General of New Jersey and The Secretary of State (*Jeffrey S. Chiesa,* Attorney General, attorney; *Robert T. Lougy,* Assistant Attorney General, of counsel; *John P. Bender,* Assistant Attorney General and *George N. Cohen,* Deputy Attorney General, on the briefs).

*Steven P. Weissman* submitted a brief on behalf of amici curiae Communications Workers of America, AFL–CIO, Latino Action Network, Women's Political Caucus of New Jersey, Latino Coalition of Monmouth County, Latinas United for Political Empowerment Action Committee and The New Jersey Muslim Lawyers Association (*Weissman & Mintz,* attorneys; *Mr. Weissman, Adam M. Gordon,* and *Ira W. Mintz* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

This matter involves the November 8, 2011 election for the New Jersey General Assembly representatives for the Fourth Legislative District. Gabriela Mosquera received the second highest number of votes, but her election was challenged, in timely fashion under the election statutes, by Shelley Lovett, the candidate who had the third highest number of votes. Lovett alleged that Mosquera was ineligible because she failed to meet the one-year durational residency requirement for the office set forth in Article IV, Section 1, Paragraph 2 of the New Jersey Constitution. Complicating the matter was the decision and accompanying order

in *Robertson v. Bartels*, 150 *F.Supp.*2d 691 (D.N.J.2001), wherein a federal trial court had concluded that Article IV, Section 1, Paragraph 2 of our State Constitution violates the Fourteenth Amendment of the United States Constitution and had enjoined the New Jersey Attorney General and Secretary of State from enforcing the provision's one-year durational residency requirement for eligibility for General Assembly office.

Before the state trial court, all parties agreed that state courts were not bound by the *Robertson* injunction and therefore were not precluded from considering the election contest on the eligibility grounds raised. The trial court concluded that the durational residency requirement withstood both facial and as-applied constitutional challenges and declared Mosquera's election null and void because she was not a resident of the district for one year prior to the date of her election as required by the New Jersey Constitution. The court's order annulled her election, declared a vacancy in the seat for which she had been the incumbent as a result of the November 8, 2011 election, and directed that the vacancy be filled by the process established under Article IV, Section 4, Paragraph 1 of the New Jersey Constitution, and its implementing legislation, *N.J.S.A.* 19:27–11.2. Pursuant to that process, the county committee of Mosquera's political party would select an interim successor to fill the office until a special election for the office was held at the next general election.

The procedural history that brought this case on its expedited path to this Court will be recited in detail hereafter. In its present posture, the case presents three main questions. First, does the durational residency requirement to run for the New Jersey General Assembly found in Article IV, Section 1, Paragraph 2 of the New Jersey Constitution violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution? Second, in the event we determine that the New Jersey Constitution's durational residency requirement does not violate the Equal Protection Clause, must, or should, that holding be made prospective in light of *Robertson's* holding? And, third, if

this Court determines that the durational requirement is constitutional and need not be limited to prospective application, what remedy is available in the circumstances that have occurred in the Fourth Legislative District?

Our determination of those questions leads us to affirm the judgment of the trial court. We hold that the New Jersey Constitution's durational residency requirement for members of the New Jersey General Assembly is to be tested in accordance with the intermediate scrutiny standard, rather than the strict scrutiny analysis employed by the federal court in the *Robertson* decision. Given the application of an erroneous standard to a record that included flawed facts, it is not surprising that the federal court reached a conclusion that is, at best, questionable; however, the fact remains that the decision is squarely at odds with other rulings concerning durational residency requirements. Accordingly, we are not persuaded by the determination in *Robertson* when performing our own analysis of the federal equal protection question presented.

Our independent analysis of the constitutional question leads us to conclude that the durational residency requirement is constitutional, a conclusion fully in accord with case law around the country that has recognized the validity of durational residency requirements. And, our decision respects and effectuates the will of the people of New Jersey to impose, through a state constitutional requirement, a durational residency requirement for state legislative office.

We further conclude that our decision is not a "new" ruling as there has never been a state court judgment finding that our constitutional requirement violates equal protection. That the federal court reached a contrary conclusion in *Robertson* that appears erroneous and is out of sync with decisions of other federal and state courts in cases reviewing equal protection challenges to intrastate durational residency requirements for office, does not render our judgment "new." We therefore decline to abrogate our 235–year–old State Constitution's requirement by

limiting the effect of our judgment through prospective application.

On the issue of remedy, we conclude, as did the trial court, that the position is vacant and that Mosquera was the incumbent at the time of the vacancy. Therefore, the constitutional and statutory procedures for filling this vacancy will permit the county committee of the party with which Mosquera was affiliated during her election—the Democratic Party—the opportunity to select an interim successor for the vacant seat. Under our construction of the vacancy-filling provisions, Mosquera would meet eligibility requirements for appointment as the interim successor if selected by her party. And, finally, we are satisfied by the representation of the Attorney General that the Secretary of State and the Attorney General will not run afoul of the injunction issued in *Robertson* when performing the tasks associated with filling the seat declared vacant by operation of the trial court's judgment, now affirmed by this Court.

That said, this matter must not end here. In view of the complicated situation presented by the outstanding federal injunction directed at the Attorney General and the Secretary of State, the parties should either apply to the federal district court or should petition the United States Supreme Court for a writ of certiorari in order to resolve lingering conflicts that exist between our declaration of the constitutionality of Article IV, Section 1, Paragraph 2 of the New Jersey Constitution and the injunction. It is beyond our power to modify or dissolve that injunction and we do not purport to do so here. But it is our duty to interpret and enforce our Constitution and that we have done. We rely on the parties to bring to the federal courts the questions about the continued effect, if any, to be given to the *Robertson* injunction.

I.

The Fourth Legislative District that is at the center of this dispute consists of nine municipalities located in portions of Camden and Gloucester Counties and has an estimated population of

approximately 224,000. Prior to the 2011 General Election, the Fourth District was represented in the General Assembly by Paul Moriarty, a Democrat, and Domenick DiCicco, a Republican. Following the 2011 reapportionment, DiCicco was no longer a resident of the Fourth District and therefore did not seek reelection in the district.

Mosquera has lived in New Jersey since early childhood. Prior to 2010, she lived in Union City, Trenton, Hamilton, North Bergen, and Deptford, none of which is in the Fourth District. She attended college at Seton Hall University and The College of New Jersey, both located outside of the Fourth District. Mosquera worked on the staff of a member of the Assembly representing the Fifth District and for the Assembly Democratic Office in Trenton. On January 4, 2010, she commenced employment as an assistant to the Mayor of Gloucester Township, a municipality assigned to the Fourth District both before and after the 2011 legislative reapportionment. That employment brought her into direct contact with the Fourth District for the first time.

On November 13, 2010, Mosquera, at the time a resident of Maple Shade, a municipality then assigned to the Seventh Legislative District, entered into a contract to purchase a home in Blackwood, Gloucester Township. The purchase of Mosquera's Gloucester home, which for the first time made her a resident of the Fourth District, was finalized at a closing on December 29, 2010. She moved to Gloucester Township immediately thereafter. In February 2011, Mosquera changed her driver's license to her Gloucester Township address and voted as a resident of that municipality in the local fire district election. Mosquera testified that she did not purchase her Gloucester Township home with the intent to run for office in the Fourth District. She stated that she decided to run because of "an opportunity that was brought to me—to my attention in 2011. I can't recall when specifically."

Mosquera testified that she does not recall exactly when in 2011 she commenced her run for the General Assembly. She coordinated her campaign with the campaigns of Senator Fred Madden

and Assemblyman Moriarty. She testified that, in the course of her campaign, she campaigned virtually every night after work and on weekends, making telephone calls, knocking on doors and attending events. And, she met thousands of residents in visits to most of the municipalities that comprise the Fourth District.

Lovett, who ran as a Republican candidate for the Assembly, testified that at the time of the 2011 Assembly election, she had lived in Gloucester Township for approximately thirty-two years. After the June 2011 primary, she "heard a rumor" that Mosquera had not been a resident of Gloucester Township a full year prior to the November 2011 election. Lovett testified that she did not litigate Mosquera's compliance with Article IV, Section 1, Paragraph 2 of the New Jersey Constitution at that time because she "didn't have the money or the resources to do so."

The General Election was held on November 8, 2011. The results of that election were as follows:

| Candidate | Vote Tally |
|---|---|
| Paul D. Moriarty (Democrat) | 21,086 |
| Gabriela Mosquera (Democrat) | 19,907 |
| Shelley Lovett (Republican) | 14,351 |
| Patricia Fratticioli (Republican) | 14,000 |
| Tony Celeste (Independent) | 1,767 |

On December 1, 2011, three weeks after the election, Lovett filed an Election Challenge Petition pursuant to *N.J.S.A.* 19:29–1 to –14, alleging that Mosquera was not constitutionally qualified to represent the Fourth District in the Assembly because she had lived in the District less than one year prior to her election. Lovett sought an order "[d]eclaring Petitioner Lovett duly elected to the office of New Jersey Fourth District General Assembly," declaring Mosquera "not duly elected" to that office, and assessing costs.

Lovett's petition for emergency relief was denied by the trial court without prejudice. Mosquera moved to dismiss the petition, and the trial court held a hearing on December 19, 2011. At the outset of that hearing, the parties stipulated that *Robertson, supra,* was entitled to deference but was not binding on the trial court. Mosquera stipulated that she did not meet the one-year durational residency requirement and that this case did not present circumstances in which a candidate's residency became an issue because her municipality had been removed from her district by virtue of reapportionment. Further, the Attorney General represented that she considered herself enjoined by *Robertson* from enforcing Article IV, Section 1, Paragraph 2 of the New Jersey Constitution. Following the testimony of Mosquera and Lovett and the argument of counsel, the trial court denied the motion to dismiss and scheduled a second day of hearing for January 5, 2012. On that hearing date, the Attorney General stated that her position had "always been that the constitutional provision was constitutional," but that her office considered itself to be "enjoined from enforcing [the provision]" by *Robertson* and, accordingly, had advised candidates that "you can be a candidate without the one year residency restriction."[1]

At the conclusion of the proceeding on January 5, 2012, the trial court issued an order annulling Mosquera's certificate of election, setting aside the November 8, 2011 election in the Fourth District as to Mosquera only, and enjoining Mosquera from taking office. It directed that the vacancy created by virtue of its order be filled by an election to take place, in accordance with the procedure outlined in *N.J.S.A.* 19:27–11.2, at the next General Election on November 6, 2012. It further ordered that the vacancy should be filled "within 35 days of January 10, 2012, by an interim successor who is a member of the Democratic Party, selected by the appropriate members of the Democratic County Committees." The court retained jurisdiction and, on January 7, 2012, issued a

---

[1] Mosquera conceded, however, that she did not rely on any such representation when deciding to run in the Fourth Legislative District.

detailed amended opinion setting forth the basis for its January 5, 2012 order. Relying on *Matthews v. City of Atlantic City*, 84 *N.J.* 153, 417 *A.2d* 1011 (1980), the court applied an intermediate scrutiny test to Article IV, Section 1, Paragraph 2. It concluded the provision to be constitutional on the ground that it furthers legitimate state interests and is reasonably and suitably tailored to those interests. The court stated that it would be "presumptuous" for it to strike down a provision "which has been in New Jersey's Constitution since 1776, and has been considered and approved by New Jersey's voters in 1844, 1947, and 1966." The trial court held that the residency requirement is constitutional as applied to the 2011 District Four General Assembly election, rejected Mosquera's claim that Lovett's challenge was barred by the doctrine of laches, and held that the *Robertson* injunction did not bar its consideration of the dispute. It declined to hold that its ruling was solely prospective.

The trial court also considered the appropriate remedy. Construing the term "incumbent" in *N.J.S.A.* 19:29-1 ("[t]he term incumbent means the person whom the canvassers declare elected") to mean "the candidate whose election is challenged," it found that *N.J.S.A.* 19:29-9 compelled the annulment of Mosquera's certificate of election, creating a vacancy. Applying *N.J.S.A.* 19:27-11.2, which requires that a vacancy be filled "within 35 days by a member of the political party of which the person who vacated the office was the candidate at the time of his election thereto," the trial court concluded that Mosquera had "vacated the office," and that the Democratic Party should therefore select the person to fill the seat. The trial court noted that that remedy would effectuate the will of the voters of the Fourth District to the extent possible.

Immediately following the trial court's January 5, 2012 order, Mosquera asked the trial court to stay that order and filed a notice of appeal and motion for emergent relief in the Appellate Division. On January 9, 2012, the trial court denied Mosquera's motion for a stay. That day, the Appellate Division heard oral

argument on Mosquera's application for a stay and for emergent relief. It granted the motion to proceed on an emergent basis and granted Mosquera's emergent application for a stay of the trial court's opinion and denial of a stay. The Appellate Division order resulted in staying the trial court's order that had annulled the certificate of election and had enjoined Mosquera from taking the oath of office. The Appellate Division also ordered briefing on an expedited basis. The panel's order was based on its finding that Mosquera was likely to succeed on the merits of her claim that the trial court's decision upholding the constitutionality of the residency requirement should apply only prospectively.

On January 9, 2012, Lovett filed a motion for emergent relief in this Court. The following day, this Court vacated the Appellate Division panel's order and temporarily reinstated the relief that had been granted by the trial court. *In re Contest of Nov. 8, 2011 Gen. Election of Office of N.J. Gen. Assembly, Fourth Legislative Dist.,* —— *N.J.* ——, —— *A.*3d —— (2012). On January 11, 2012, Lovett filed a notice of cross-appeal in the Appellate Division. On January 13, 2012, Lovett moved before the trial court to stay that portion of the trial court's January 5, 2012 order that directed that the vacancy created by the annulment of Mosquera's certificate of election be filled with a person selected by the Democratic Party. The same day, this Court, on its own motion, certified this case, *see R.* 2:12–2, ordered expedited briefing, and stayed the judgment of the trial court insofar as it directed the selection of an interim successor. *In re Contest of Nov. 8, 2011 Gen. Election of Office of N.J. Gen. Assembly, Fourth Legislative Dist.,* 209 *N.J.* 339, 37 *A.*3d 1089 (2012).

## II.

We turn first to the fundamental issue in this case, which concerns the validity of the durational residency requirement for membership in the New Jersey General Assembly that is found in Article IV, Section 1, Paragraph 2 of the New Jersey Constitution. That paragraph provides as follows:

> No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, and of the district for which he shall be elected one year, next before his election.
>
> [*N.J. Const.* art. IV, § 1, ¶ 2.]

Contrary to the *Robertson* court's mistaken impression that the durational residency requirement is of recent vintage, the requirement can be traced back to the earliest days of the Republic. The first New Jersey Constitution, signed on July 2, 1776, contained a one-year residency requirement for members of the General Assembly.[2] The 1844 Constitution preserved the one-year durational requirement.[3] The requirement is not unusual. As the trial court explained,

> [a]lmost every state has enacted durational residency requirements for state legislators. Forty-four states, and the United States Constitution, require candidates for the legislature to have residence of a year or more. Like the federal constitution, and most states, New Jersey has provided such residency requirements for both houses of the legislature.
>
> [ (citations omitted).]

It is undisputed that Mosquera did not meet the durational residency requirement at the time she ran for office. She, however, contends that the requirement violates the Equal Protection Clause of the Fourteenth Amendment, which provides that no state "shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const.* amend. XIV, § 1. She raises both a facial and an as-applied challenge.

---

2 Specifically, the 1776 Constitution stated that "each county shall also choose three members of assembly; provided, that no person shall be entitled to a seat in the said assembly, unless he be and have been, for one whole year next before the election, an inhabitant of the county he is to represent, and worth five hundred pounds, proclamation money, in real and personal estate in the same county." *N.J. Const. of 1776* art. III.

3 The 1844 Constitution provided that "no person shall be a member of the general assembly who shall not have attained the age of twenty-one years, and have been a citizen and inhabitant of the state for two years, and of the county for which he shall be chosen one year, next before his election." *N.J. Const. of 1844* art. IV, § 1, ¶ 2.

## A.

■ On the threshold question of whether we are barred from considering the constitutional question at all in light of the *Robertson* decision, the parties agree that a federal district court's ruling on the subject does not preclude the courts of the State of New Jersey from also ruling on whether the Equal Protection Clause of the Fourteenth Amendment bars enforcement of our State Constitution's durational residency requirement for membership in the General Assembly.

■ Their concession is in accord with previous case law, which also clearly recognizes that a state court is not barred from addressing federal constitutional questions about state statutes, and perforce federal constitutional challenges to our State Constitution, notwithstanding a lower federal court ruling on the subject. *See State v. Coleman,* 46 *N.J.* 16, 36–37, 214 *A.2d* 393 (1965), *cert. denied,* 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.2d* 212 (1966) (noting that state courts and federal trial and intermediate appellate courts occupy comparable positions in respect of federal constitutional questions and declining to follow Court of Appeals's resolution of federal constitutional question); *see also State v. Norflett,* 67 *N.J.* 268, 286–87, 337 *A.2d* 609 (1975) (noting same when declining to regard three-judge federal district court's holding as controlling on constitutionality of state statute). While comity requires that we give due respect to the holding of the federal district court in *Robertson,* ultimately the courts of this state, up to and including this Court, and the trial and intermediate federal courts possess an independent ability to address federal constitutional issues:

> In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court.
>
> [*Coleman, supra,* 46 *N.J.* at 36, 214 *A.2d* 393.]

Thus, mindful of the judgment of the federal court in *Robertson,* we conduct an independent analysis of the constitutionality of

Article IV, Section 1, Paragraph 2, which never has been brought into question by any previous state court judgment.

## B.

We begin with Mosquera's contention that the durational residency requirement is facially unconstitutional.

### 1.

■ Just last term, this Court addressed the standard to be applied when considering a facial challenge to the constitutionality of a statute or other legislative provision. *See Whirlpool Props., Inc. v. Dir., Div. of Taxation*, 208 *N.J.* 141, 26 *A.*3d 446 (2011). We held, in the context of a facial challenge to a tax statute, that the long-standing test set forth in *United States v. Salerno*, 481 *U.S.* 739, 107 *S.Ct.* 2095, 95 *L.Ed.*2d 697 (1987), governed our analysis. *Whirlpool, supra*, 208 *N.J.* at 176–77, 26 *A.*3d 446. Thus, a statute must be upheld "if it can be shown to operate constitutionally in some, even if not all or most, instances." *Id.* at 156, 26 *A.*3d 446 (citing *Pfizer Inc. v. Dir., Div. of Taxation*, 24 *N.J.Tax* 116, 123–24 (Tax 2008); *Gen. Motors Corp. v. City of Linden*, 150 *N.J.* 522, 532, 696 *A.*2d 683 (1997)).

At the same time, we recognized that some members of the United States Supreme Court have called the *Salerno* standard into question. *Compare City of Chicago v. Morales*, 527 *U.S.* 41, 55 n. 22, 119 *S.Ct.* 1849, 1858 n. 22, 144 *L.Ed.*2d 67, 79–80 n. 22 (1999) (expressing majority's belief that *Salerno* has "never been the decisive factor in any decision of this Court," while refusing to "resolve the viability of *Salerno's* dictum") *with City of Chicago, supra*, 527 *U.S.* at 81, 119 *S.Ct.* at 1871, 144 *L.Ed.*2d at 95 (Scalia, J., dissenting) (adhering to *Salerno's* test in which party bringing facial challenge must show that challenged provision is "invalid in all its applications").

Nevertheless, the United States Supreme Court, in more recent cases, continues to apply *Salerno* and has also set out a second standard for analyzing facial challenges with which "all [justices]

agree"—whether "the statute has a 'plainly legitimate sweep.' " *Wash. State Grange v. Wash. State Rep. Party,* 552 *U.S.* 442, 449, 128 *S.Ct.* 1184, 1190, 170 *L.Ed.*2d 151, 160 (2008) (quoting *Washington v. Glucksberg,* 521 *U.S.* 702, 740 n. 7, 117 *S.Ct.* 2302, 2305 n. 7, 138 *L.Ed.*2d 772, 800 n. 7 (1997) (Stevens, J., concurring in judgments)). Under the latter standard, the Court continues to consider whether hypothetical constitutional applications of the challenged statute exist. *Id.* at 456–57, 128 *S.Ct.* at 1194, 170 *L.Ed.*2d at 164–65 (rejecting facial challenge to law governing primary elections in which challengers raised associational right claims where Court could hypothesize constitutional formulation for primary ballot). The Court stressed that, when confronted with a facial challenge, a court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases" under which the statute might present constitutional problems. *Id.* at 450, 128 *S.Ct.* at 1190, 170 *L.Ed.*2d at 160 (citation omitted).

■ Despite the uncertainty surrounding the *Salerno* standard, New Jersey law has always been clear—a statute is "presumed constitutional and . . . 'is not facially unconstitutional if it operates constitutionally in some instances.' " *Whirlpool, supra,* 208 *N.J.* at 175, 26 *A.*3d 446 (quoting *Linden, supra,* 150 *N.J.* at 532, 696 *A.*2d 683). That standard applies, with the fullest of force, when considering a federal constitutional challenge to a provision in the New Jersey Constitution. In mounting its challenge to the majority's analysis, the dissent attacks our use of *Salerno,* but points to only one case, from the Federal Circuit Court of Appeals, that lends anemic support the dissent's way, but even it does not reject *Salerno. See post* at 83, 40 *A.*3d at 716 (citing *Berkley v. United States,* 287 *F.*3d 1076, 1090 n. 14 (2002)). At the same time, the dissent sidesteps, without elaboration, two more recent circuit court decisions that undercut the dissent's epiphany on the subject since issuance of our opinion in *Whirlpool. See post* at 82, 40 *A.*3d at 716. At bottom, the dissent cannot demonstrate that there is precedent for abandonment of the *Salerno* standard and, there-

fore, has no basis for criticizing its use in this matter. In this challenge, we stand by the unanimous determination in *Whirlpool* to continue applying *Salerno* when "[w]e see no ready or clear indication that the Supreme Court has signaled its abandonment." 208 *N.J.* at 176, 26 *A.*3d 446.

Thus, with that standard as our measure, we turn to the federal equal protection challenge at issue in this case.

2.

It is well-settled that "the equal protection clause does not require the state to treat all persons alike." *Price v. Cohen,* 715 *F.*2d 87, 91 (3d Cir.1983) (citing *Tigner v. Texas,* 310 *U.S.* 141, 147, 60 *S.Ct.* 879, 882, 84 *L.Ed.* 1124, 1128 (1940)). "To establish a violation of the equal protection clause, a plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group. The level of deference shown to the state-created categories varies according to the group discriminated against and the right or interest infringed." *Id.* at 91–92. The starting point for any equal protection analysis is to determine the standard of review, or level of scrutiny, that should be applied to the challenged classification. *See, e.g., Nordlinger v. Hahn,* 505 *U.S.* 1, 10, 112 *S.Ct.* 2326, 2331, 120 *L.Ed.*2d 1, 12 (1992); *City of Cleburne v. Cleburne Living Ctr.,* 473 *U.S.* 432, 440, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985).

Previous case law of this Court has applied an intermediate scrutiny analysis to an equal protection challenge to a durational residency requirement to run for a specific municipal office. In *Matthews, supra,* 84 *N.J.* at 155, 417 *A.*2d 1011, this Court considered a statutory requirement that candidates for election to the Board of Commissioners of Atlantic City have resided in the city for two years prior to the election. The statute applied to some New Jersey municipalities, but not to others. *Ibid.* Applying the intermediate scrutiny test, the Court struck down the residency requirement because the State had not justified "why voters in some municipalities may vote only for candidates satisfying a two-year residency requirement while voters in other munici-

palities are not so restricted." *Id.* at 173, 417 *A.*2d 1011. Importantly, in determining that intermediate scrutiny was the correct standard to apply, the *Matthews* Court found that durational residency requirements do not "directly interfere with the exercise of the fundamental right to vote[ ]," *id.* at 168, 417 *A.*2d 1011, but have a significant indirect effect on "the voter's freedom of choice," *id.* at 169, 417 *A.*2d 1011.

In contrast, in *Robertson*, the federal court applied strict scrutiny in the context of an equal protection challenge to the durational residency requirement to run for the General Assembly of the New Jersey Legislature and declared that the requirement ran afoul of equal protection. *Robertson, supra,* 150 *F.Supp.*2d at 698.

Against that backdrop, we address the standard that should apply in the instant matter.

3.

Determining the proper level of scrutiny requires identification of the personal liberty interests implicated by the durational residency requirement and an assessment of the extent to which the requirement burdens those interests.

In the event that a classification directly burdens a fundamental personal liberty interest, it is beyond dispute that strict scrutiny applies in an equal protection challenge. *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 *U.S.* 1, 31, 93 *S.Ct.* 1278, 1296, 36 *L.Ed.*2d 16, 42 (1973); *Graham v. Richardson,* 403 *U.S.* 365, 375–76, 91 *S.Ct.* 1848, 1853–54, 29 *L.Ed.*2d 534, 534–35 (1971); *Kramer v. Union Free Sch. Dist. No. 15,* 395 *U.S.* 621, 626, 89 *S.Ct.* 1886, 1889–90, 23 *L.Ed.*2d 583, 589 (1969); *Shapiro v. Thompson,* 394 *U.S.* 618, 634, 89 *S.Ct.* 1322, 1331, 22 *L.Ed.*2d 600, 615 (1969). However, classifications that do not implicate a fundamental liberty interest, or that affect a fundamental liberty interest in only an indirect way, are not similarly guaranteed that highest level of scrutiny. Courts around the country have assessed liberty interests impacted to various degrees by durational

residency requirements, and those decisions provide guidance in our analysis of this matter.

That said, the analysis rightfully begins with a pair of foundational Supreme Court cases decided in 1972 that generated the language and conceptual tools ensuing courts have used to analyze equal protection challenges involving durational residency requirements. Those cases clarified that the standard to be applied is based on the personal liberty that is burdened, or impacted, by the challenged durational residency requirement.

In *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.*2d 274 (1972), the Supreme Court held that a durational residency requirement imposed on voters is subject to strict scrutiny because it directly impacts the fundamental right to vote and burdens the right to interstate travel. In that matter, the plaintiffs challenged a Tennessee statute that required one year of residency in the state and three months of residency in the county in which the citizen would vote. *Id.* at 334, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 279. The Court's analysis followed its traditional approach when reviewing equal protection claims: "[W]e look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Id.* at 335, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 280. The Court determined that the challenged classification affected two fundamental personal interests, *id.* at 341, 92 *S.Ct.* at 1002, 31 *L.Ed.*2d at 283–84, and held that the restriction was subject to strict scrutiny, under which "the State must show a substantial and compelling reason for imposing durational residence requirements," *id.* at 335, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 280.

The State advanced two purported interests: preventing voter fraud and ensuring that only knowledgeable voters participate in elections. *Id.* at 345, 92 *S.Ct.* at 1004, 31 *L.Ed.*2d at 286. Although the Court viewed the first interest as legitimate, it concluded that the chosen method of excluding new residents as the means of furthering that interest was too "crude" and ill-fitted to

survive close scrutiny. *Id.* at 351, 92 *S.Ct.* at 1007, 31 *L.Ed.*2d at 289. As for the second interest, the Court stated that, whatever validity there was to it, excluding new residents was too rough a means to achieve it. *Id.* at 358, 92 *S.Ct.* at 1011, 31 *L.Ed.*2d at 294. The Court concluded that the classification could not hurdle the strict scrutiny test.

In the other seminal case, *Bullock v. Carter*, 405 *U.S.* 134, 92 *S.Ct.* 849, 31 *L.Ed.*2d 92 (1972), the Court assessed for the first time the constitutionality of a restriction on the right to run for public office. There, the plaintiffs challenged Texas's primary election system, in which, in order to be on the ballot, candidates were required to pay filing fees that were claimed to discriminate against the less well-off: although the amount of the fees varied depending on the office sought, the fee could be as much as $8,900 and amount to 99.7 percent of the annual salary of the position sought. *Id.* at 138 n. 10, n. 11, 92 *S.Ct.* at 853 n. 10, n. 11, 31 *L.Ed.*2d at 97 n. 10, n. 11.

The Supreme Court ultimately was not persuaded that a candidate filing fee implicated the same concerns as monetary restrictions on the right to vote, which are always subject to strict scrutiny. *Id.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100 (citing *Harper v. Va. Bd. of Elections*, 383 *U.S.* 663, 86 *S.Ct.* 1079, 16 *L.Ed.*2d 169 (1966)). The Court's decision importantly recognized a connection between the right to vote and the right to run for public office, *see id.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 99 ("the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters"), but held that a restriction on the right to run for public office does not compel a strict scrutiny analysis, *see ibid.* Specifically, the Court stated that a barrier that limits the field of candidates from which voters can choose "does not of itself compel close scrutiny." *Id.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. Courts called on to review equal protection challenges in such settings were told to "examine

in a realistic light the extent and nature of [the barrier's] impact on voters." *Ibid.*

Applying those principles in *Bullock,* the Supreme Court stated that the "Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate ... the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives." *Id.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. Determining that the filing-fee system was "extraordinarily ill-fitted" to achieving the State's professed interest in weeding out frivolous candidates, *id.* at 146, 92 *S.Ct.* at 857, 31 *L.Ed.*2d at 101, the Court declared unconstitutional the filing fee system, *id.* at 149, 92 *S.Ct.* at 859, 31 *L.Ed.*2d at 103.

Thus, as reflected in *Dunn* and *Bullock,* a durational residency requirement imposed on voters is subject to strict scrutiny to the extent that it directly burdens the fundamental right to vote and right to engage in interstate travel. Strict scrutiny is similarly required when a durational requirement imposed on candidates for office involves a suspect classification, or when operation of the durational requirement has a "real and appreciable impact" on the exercise of the franchise. *Bullock, supra,* 405 *U.S.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. In conducting the careful analysis required in the latter category of cases, *Bullock* directs courts to "examine in a realistic light the extent and nature of [a restriction's] impact on voters." *Id.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100.

4.

In this matter, zeroing in on the level of scrutiny is simplified by the fact that we are not dealing with a durational residency requirement's impact on the right to interstate travel. Courts have long held that the right to interstate travel is fundamental, and that restrictions on that right are normally subject to strict scrutiny. *See, e.g., Shapiro, supra,* 394 *U.S.* at 634, 89 *S.Ct.* at

1331, 22 *L.Ed.*2d at 615. ("[A]ny classification which serves to penalize the exercise of [the right to interstate travel], unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." (emphasis and citations omitted)); *Memorial Hosp. v. Maricopa Cnty.*, 415 *U.S.* 250, 258–59, 94 *S.Ct.* 1076, 1082, 39 *L.Ed.*2d 306, 315 (1974). This case does not involve a burden on a candidate's right to travel interstate.

Restrictions that burden a candidate's intrastate movement, which is involved in the instant matter, warrant a different approach. In *Lutz v. City of York*, 899 *F.*2d 255 (3d Cir.1990), the Third Circuit held that restrictions on the right to travel within a state are subject to intermediate scrutiny, and will be upheld if "narrowly tailored" to achieve a "significant" government interest. *Id.* at 270. Although that standard was not expressed in the context of a durational residency requirement, subsequent courts have relied on it when assessing the constitutionality of requirements that candidates reside in the subdivision of the state in which they run for office. *See, e.g., Callaway v. Samson*, 193 *F.Supp.*2d 783, 784 (D.N.J.2002).

As for the level of scrutiny that has been found applicable to burdens on the right to run for public office, a canvassing of the case law reveals that the level has depended on the degree to which a restriction also burdens the right to vote. That approach follows from the directive in *Bullock* that courts must "examine in a realistic light" the restriction's "impact on voters." *Bullock, supra,* 405 *U.S.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100.

Since the Supreme Court's decision in *Bullock*, there has been general consensus that strict scrutiny should not apply to requirements that candidates live in a district or municipality for a particular duration. With the development of the intermediate scrutiny analysis, that level appears to have become the more commonly applied level of scrutiny. *See, e.g., Beil v. Akron*, 660 *F.*2d 166, 169 (6th Cir.1981) (applying "lesser standard" than strict scrutiny); *Joseph v. Birmingham*, 510 *F.Supp.* 1319, 1328 (E.D.Mich.1981) (applying intermediate scrutiny); *Matthews, su-*

*pra*, 84 *N.J.* at 167–68, 417 *A.*2d 1011 (applying intermediate scrutiny). *But see MacDonald v. City of Henderson*, 818 *F.Supp.* 303, 305–06 (D.Nev.1993) (applying rational basis review); *Daves v. City of Longwood*, 423 *F.Supp.* 503, 506 (M.D.Fla.1976) (same). Indeed, since *Bullock*, only *Robertson* has applied strict scrutiny to a durational residency requirement challenge that did not involve a burden on interstate travel. *Compare Draper v. Phelps*, 351 *F.Supp.* 677, 681 (W.D.Okla.1972) (applying "compelling interest" test pre-*Bullock* ), *and Robertson, supra*, 150 *F.Supp.*2d at 695 (applying same standard), *with Joseph, supra*, 510 *F.Supp.* at 1335 (applying intermediate scrutiny), *and Beil, supra*, 660 *F.*2d at 169 (applying "lesser standard" than strict scrutiny).[4] Post-*Bullock*, courts that have applied strict scrutiny to durational residency requirements have done so only when those requirements imposed a burden on the right to interstate travel and have based the strict scrutiny analysis on that interference, not on the requirement's asserted interference with the right to run for office. *See, e.g., Sununu v. Stark*, 383 *F.Supp.* 1287, 1290 (D.N.H.1974), *aff'd mem.*, 420 *U.S.* 958, 95 *S.Ct.* 1346, 43 *L.Ed.*2d 435 (1975) (applying strict scrutiny where interstate travel was burdened by residency restriction); *Chimento v. Stark*, 353 *F.Supp.* 1211, 1214 (D.N.H.), *aff'd mem.*, 414 *U.S.* 802, 94 *S.Ct.* 125, 38 *L.Ed.*2d 39 (1973) (same). Thus, in *Joseph, supra*, where interstate travel played no role in the assessment of the burden imposed by a durational residency requirement, the Eastern District of Michigan held that it would not apply strict scrutiny to a city charter provision requiring that a candidate for city commissioner have lived in the city for one year preceding the election because there was no indication that the "requirement has had an inordinate impact on any discrete political group ... [or] that the field of choice has been drastically reduced." 510 *F.Supp.* at 1330. Like-

---

[4] Moreover, two of the cases on which the *Robertson* court's decision heavily relied, *Chimento v. Stark*, 353 *F.Supp.* 1211 (D.N.H.1973), and *Sununu v. Stark*, 383 *F.Supp.* 1287 (D.N.H.1974), involve the right to interstate travel and not the right to intrastate travel.

wise, in *Beil, supra*, the Sixth Circuit found that a city requirement that candidates for city council reside in the city for one year before running did not warrant strict scrutiny for much the same reasons. 660 *F*.2d at 169.

■ *Robertson* stands alone in its application of the strict scrutiny standard when reviewing an intrastate durational residency requirement imposed on a candidate for office. Intermediate scrutiny is the generally accepted test around the nation—except when courts have found the less rigorous rational basis test to be suitable—and it is the test used in this State for analyzing allegations of unfair demarcations between durational residency requirements for office. *See Matthews, supra*, 84 *N.J*. at 167, 417 *A*.2d 1011 (declaring unconstitutional state statute that differentiated among types of municipalities when imposing durational residency requirements). We hold that the intermediate scrutiny test is the appropriate standard for use in the instant analysis.[5] *Robertson's* use of strict scrutiny undermines its analysis and, consequently, its persuasiveness.

5.

■ Having identified the appropriate standard of review, that standard must now be applied to the facts of this case. Specifically, we must determine whether the durational residency requirement embodied in Article IV, Section 1, Paragraph 2 of our State Constitution is "reasonably and suitably tailored to further legitimate governmental objectives."[6] *Matthews, supra*, 84 *N.J*. at 169, 417 *A*.2d 1011. That inquiry requires two steps: first, the

[5] To the extent that the Attorney General seeks application of the rational basis test, we decline his invitation to consider lessening the scrutiny that, in *Matthews*, this Court previously held to be appropriate for analyzing the intrastate impact of a durational residency requirement for office.

[6] We recognize that courts have framed the intermediate scrutiny standard in a variety of ways, *see, e.g., Callaway, supra*, 193 *F.Supp*.2d at 786 (residency requirement must be "narrowly tailored" to serve "significant government interests"), but we adhere to our articulation of the standard in *Matthews*.

state interests purportedly advanced by a durational residency requirement must be identified; and, second, the extent to which those interests are legitimate and advanced by the durational residency requirement must be assessed.

The parties have identified three state interests served by the imposition of durational residency requirements on candidates for public office. First, such requirements ensure that voters have time to develop a familiarity with the candidate. Second, they ensure that the candidate can become familiar with the constituency and the issues facing the people to be represented. Third, they operate as a curb on carpetbagging. We note that those interests mirror those identified by other courts when considering similar durational residency requirements. *See, e.g., Callaway, supra,* 193 *F.Supp.*2d at 787; *Robertson, supra,* 150 *F.Supp.*2d at 696; *Sununu, supra,* 383 *F.Supp.* at 1290; *Chimento, supra,* 353 *F.Supp.* at 1215. In our view, the one-year durational residency requirement advances those state interests more than sufficiently to surpass a facial constitutional challenge.

The one-year residency requirement establishes a fair and not unduly burdensome period for a new resident candidate to become familiar with the people and issues of the district and, conversely, for the people to become familiar with a new resident in the district. As the trial court astutely observed in this matter:

Though New Jersey is a small state, it is also a diverse one, with differing interests between north and south, rural and urban, shore and mountain. A candidate from one of those areas (e.g., Cape May) is not necessarily knowledgeable about, or known in, other diverse districts of the State (e.g., Newark). New Jersey is also a populous state, with each legislative district containing about 220,000 people. It is hardly an insubstantial interest, with such large and diverse districts, to require persons newly arrived in a district to spend time learning about, and becoming known to, the District population they seek to represent.

The one-year requirement further ensures that members of the General Assembly have a stake in the communities they represent. *See Draper, supra,* 351 *F.Supp.* at 683 ("Absent a durational residency requirement 'carpet bagger' candidates who have no desire, as agents or representatives of the district, genuinely to acquaint themselves with the problems of a representative district

and conscientiously strive for the solution thereof in the legislative halls, can be candidates."). By requiring that members of the General Assembly live within their district for at least one year before the General Election, the constitutional requirement elicits from Assembly members a genuine demonstration of commitment to their constituents and of their dedication to the important public offices they hold.

The fundamental role of an Assemblyperson is to give his or her constituents a voice in the General Assembly, one of the two bodies of government constitutionally vested by the people with legislative power. Article IV, Section 1, Paragraph 1 of the New Jersey Constitution reposes legislative power in the General Assembly and the Senate. They alone have the power to make law and, hence, the public policy of this State. The trial court's opinion underscored the nature of the General Assembly's power, noting that

> both the Senate and the General Assembly share "[t]he legislative power," and the exercise of that power is the primary role of both bodies. *N.J. Const., Art. IV, § 1, ¶ 1.* Their powers differ in only a few particulars. Like the United States House of Representatives, only the General Assembly can originate bills for raising revenue. *N.J. Const., Art. IV, § VI, ¶ 1; U.S. Const., Art. I, § 7, ¶ 1.* Like the United States Senate, only the New Jersey Senate can give advice and consent on executive nominations. *N.J. Const., Art. V, § IV, ¶ 2; N.J. Const., Art. VI, § VI, ¶ 1; N.J. Const., Art. VII, § II, ¶ 1; U.S. Const., Art. II, § 2, ¶ 2.* Only the General Assembly can impeach a state officer, and only the Senate can try the impeachment, just like the federal House and Senate respectively. *N.J. Const., Art. VII, § III, ¶ 2; U.S. Const., Art. I, § 2, ¶ [5]; U.S. Const., Art. I, § 3, ¶ 6.* These few differences in powers hardly justify treating the two houses of the legislature so differently that durational residency can constitutionally be required for one house but not the other house.[7]

---

[7] The trial court's reference is to *Sununu, supra,* wherein the district court held, and the United States Supreme Court affirmed, that a State can constitutionally impose durational residency requirements on state senators. 383 *F.Supp.* at 1290 The court recognized that numerous other courts, with the exception of *Robertson,* have held that a state can constitutionally impose durational residency requirements for state representative, citing as examples: *Walker v. Yucht,* 352 *F.Supp.* 85, 98–100 (D.Del.1972); *Draper, supra,* 351 *F.Supp.* at 679–86; *Gilbert v. State,* 526 *P.2d* 1131, 1132–36 (Alaska 1974); *Brewster v. Johnson,* 260 *Ark.* 450, 541 *S.W.2d* 306, 309 (Ark.1976); *Hayes v. Gill,* 52 *Haw.* 251, 473 *P.2d* 872, 877–79 (1970); *McConnell v. Marshall,* 467 *S.W.2d*

█ It also bears emphasizing that the New Jersey Legislature's power is broad. Unlike the federal legislative branch, which is constrained by the Constitution's enumeration of limited powers, *U.S. Const.* art. I, § 8, the New Jersey Legislature's legislative power is plenary; it has the general authority to enact measures that promote the "public health, safety, welfare, and morals" of the citizens of New Jersey, *N.J. Shore Builders Ass'n v. Twp. of Jackson,* 199 *N.J.* 38, 52, 970 *A.*2d 992 (2009) (quotation marks and citation omitted); *see also Roselle v. Wright,* 21 *N.J.* 400, 409, 122 *A.*2d 506 (1956) (describing breadth of legislative authority to enact measures in furtherance of state's police power, which "is an essential element of the social compact, an attribute of sovereignty itself, possessed by the states before the adoption of the Federal Constitution"). Thus, the General Assembly is often called on to consider legislation that touches on significant social and deeply personal interests and concerns of the electorate. The Constitution's durational residency requirement is an acknowledgment that citizens selecting Assemblypersons to represent them, to be their voice, indeed their conscience, in such public policy matters should not only have the opportunity to learn their political views, but also to live with them in a common community. The requirement of a one-year durational residency requirement advances that significant interest.

The constitutional requirement helps ensure that the representative role an Assemblyperson is expected to carry out will be accomplished by allowing for the election of legislators that are required, modestly in comparison to the might they wield, to live with the people they represent for at least a year prior to taking office. *See Hadnott v. Amos,* 320 *F.Supp.* 107, 120–21 (M.D.Ala. 1970) *aff'd mem.,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318 (1971) (discussing importance of voter familiarity with candidate's character and life experiences). As a sister state court has noted:

318, 319–20 (Ky.Ct.App.1971); *White v. Manchin,* 173 *W.Va.* 526, 318 *S.E.*2d 470, 487–91 (1984).

[I]t is most important that electors have a period in which they may become familiar with the character, habits and reputation of candidates for political office. Modern media campaigns and 'packaged' candidates permit political hopefuls to campaign for office with little or no direct contact with the public they seek to serve. It is essential that voters have at least the opportunity to have some direct knowledge of their candidates in order to judge their sincerity and the truth of the claims which these aspirants for public office press forward through the media. It is a minimal requirement at best to ask a candidate to spend one year as a part of the community he hopes to represent in order to satisfy this need.

[*Gilbert v. State*, 526 *P.*2d 1131, 1135 (Alaska 1974).]

In our view, the *Robertson* decision seriously undervalued the legitimacy, history, and sincerity, of this State's policy choice to have a one-year durational residency requirement for General Assembly office. And, in attempting to distinguish the contrary result reached in *Chimento* and *Sununu*, which affirmed far longer durational residency requirements than the minimal one found in our State's Constitution, the *Robertson* court made an inexplicable error. It assumed that the 1947 Constitution's durational requirement lacked the "venerable heritage" of the allegedly longer-standing one of New Hampshire. *See Robertson, supra*, 150 *F.Supp.*2d at 698–99. The error exposes the questionable factual basis on which *Robertson* rests. As the opinion of the trial court in the present matter discussed, the New Jersey Constitution and the residency requirement have a far longer pedigree than the district court recognized.

[The] requirement is older than the New Hampshire constitutional provisions approved in *Chimento* and *Sununu*. Further, "the merit and political wisdom" of the one-year residency requirement has thereafter been considered and readopted by the people of New Jersey three times. *See Sununu*, 383 *F.Supp.* at 1291 (noting that the New Hampshire provision had been upheld once by the voters). Moreover, "the result would seem sound even if John Adams had not had a hand in drafting the disputed constitutional provision." *Chimento*, 353 *F.Supp.* at 1219 (Campbell, J. concurring).

. . . .

Even if Paragraph 2's durational residency requirement had been added in 1947, the New Jersey Constitution of 1947 was a very eloquent expression of the will of the people of New Jersey. For the District Court to claim that the people's will can be disregarded if a provision lacks a "venerable heritage" unfairly discounts the weight accorded to state constitutions. *See Chimento*, 353 *F.Supp.* at 1217. It also discounts the power of the people now living to govern themselves, and set the qualifications for their elected representatives. New Jersey's voters, as recently as

1966, reaffirmed that candidates for General Assembly should live with the voters they seek to represent for at least one year before the election.

In our view, *Robertson* erred in its conclusion that this long-standing requirement of state constitutional dimension in New Jersey was unconstitutional. The decision not only applied an inappropriate standard in its analysis, it also employed flawed facts and failed to appreciate the validity of the state interests that the centuries-old requirement promotes. Our State Constitution's inclusion of a reasonable, and minimal, durational residency restriction on who may hold office in the General Assembly of the Legislature constitutes a permissible exercise of state sovereignty under the Federal Constitution.[8]

Moreover, we also note that the one-year residency requirement places but a minimal burden on the right of voters to vote for the candidate of their choice. Members of the General Assembly are elected to two-year terms of office. It is the statewide office for which candidates must face election after the shortest of intervals and, therefore, with the greatest frequency. The one-year residency requirement may delay somewhat a candidate's eligibility to run for office, and consequently have some impact on the voters' ability to vote for that particular candidate but, viewed realistical-

---

[8] As the United States Supreme Court has made clear, "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 *U.S.* 452, 457, 111 *S.Ct.* 2395, 2399, 115 *L.Ed.*2d 410, 421 (1991). Other courts have found that states have the right under the Tenth Amendment to set out qualifications on those seeking state public office. *See, e.g., Oregon v. Mitchell*, 400 *U.S.* 112, 124–25, 91 *S.Ct.* 260, 264, 27 *L.Ed.*2d 272, 281 (1970) ("[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections."); *Chimento, supra*, 353 *F.Supp.* at 1215 ("A state's right to impose restrictions on one seeking public office is a power reserved to the states under the Tenth Amendment of the United States Constitution."); *Sununu, supra*, 383 *F.Supp.* at 1290 ("The State has the power, reserved to it by the Tenth Amendment to the United States Constitution ... to impose eligibility requirements upon those who seek state-elective office."). This can be compared with federal office, where "no State is empowered to exercise control over federal elections—except for those areas expressly delegated by the Constitution." *Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*, 204 *N.J.* 79, 125, 7 *A.*3d 720 (2010).

ly, the delay is relatively minimal. It has the least impact on voters compared to other statewide offices, in that candidates who miss the residency requirement for an office with a longer term must wait a longer period before running for the next ensuing term of office. *See N.J. Const.* art. IV, § 1, ¶ 2; *N.J. Const.* art. V, § 1, ¶ 2 (setting longer terms of office for State Senate and Governor, respectively).

Our conclusion that New Jersey's durational residency requirement is reasonably and suitably tailored to advance legitimate state interests places us in agreement with the majority of other courts that have considered analogous residency requirements. *See Beil, supra,* 660 *F.*2d at 169 (upholding one-year residency requirement on candidates for city council that is "reasonably necessary to effectuate an important municipal interest"); *Joseph, supra,* 510 *F.Supp.* at 1336 (upholding one-year residency requirement to run for city office under intermediate scrutiny). In fact, even when courts have subjected durational requirements to strict scrutiny—which they have done when the requirement burdens the right to interstate travel—courts have found in such facial challenges that the requirements were sufficiently narrowly tailored and served compelling government interests. *See Sununu, supra,* 383 *F.Supp.* at 1290–91; *Chimento, supra,* 353 *F.Supp.* at 1215; *Hadnott, supra,* 320 *F.Supp.* at 119–22.

Research has uncovered only one decision in which a durational residency requirement was found not to survive intermediate scrutiny, and that case involved an as-applied challenge. In *Callaway, supra,* the United States District Court for the District of New Jersey concluded that a "statutory requirement that candidates for election to local office have resided in the particular ward or district in which they seek election for one year before they may be eligible for office" was unconstitutional as applied to the unique facts of a particular candidate for office in Atlantic City. 193 *F.Supp.*2d at 784. The candidate had lived in Atlantic City his entire life and sought to run for election in a ward in which he had worked for nearly twenty years. *Ibid.* The court

held that, under those circumstances, adherence to the durational residency requirement was too "loosely" tied to the state's interests in ensuring that the voters and candidate had time to become familiar with one another. *Id.* at 787–88. The court in *Callaway* was careful to emphasize that its holding did not extend beyond the facts of that case and, as explained in more detail hereinafter, the facts in the present case are clearly distinguishable.

In sum, as the trial court's comprehensive review of the law concluded, *Robertson's* ruling represents "an anomaly." "[It] is indeed without precedent before or since. . . . [I]n case after case, courts have sustained residency requirements for state legislators." We conclude, and hold, fully in accord with the scholarly analysis of the trial court, that the intermediate scrutiny test applies and that the one-year durational residency requirement for membership in the General Assembly serves significant and legitimate interests, rendering it facially constitutional under both the *Salerno* or "plainly legitimate sweep" standards. *See Wash. State Grange, supra,* 552 *U.S.* at 449, 128 *S.Ct.* at 1190, 170 *L.Ed.*2d at 160; *Salerno, supra,* 481 *U.S.* at 745, 107 *S.Ct.* at 2100, 95 *L.Ed.*2d at 707.

### C.

We also reject Mosquera's as-applied challenge to the durational residency requirement—a challenge that she bases exclusively on her demonstration of familiarity with district constituents and issues as a result of her work in the district. Mosquera's connections to the Fourth Legislative District in no way parallel those which the court in *Callaway, supra,* found sufficient to establish that a durational residency requirement was unconstitutional as applied to the candidate in that case. In *Callaway,* the candidate had worked in the ward he sought to represent for almost twenty years and had lived in the municipality his entire life. 193 *F.Supp.*2d at 784. By contrast, Mosquera's first contact with the district came in early 2010, when she began working as an assistant to the Mayor of Gloucester Township, and

she commuted from a non-adjacent legislative district for the first year of her employment. She has none of the compelling attributes featured by the candidate in *Callaway*.

More importantly though, we reject Mosquera's as-applied challenge for the reasons recently articulated by the federal district court in *Lewis v. Guadagno*, 837 *F.Supp.*2d 404, 2011 *WL* 3957528 (D.N.J.2011). In that case, in which the court evaluated the constitutionality of New Jersey's requirement that candidates for State Senate have lived in the state for four years before running, the court identified the problems inherent in determining when a candidate's connections with a region have become sufficient to support an as-applied challenge:

> If this Court were to frame the issue as Plaintiff has, trial courts faced with as-applied challenges to this and similar provisions would have to substitute their own judgment on a case-by-case basis as to whether the particular candidate's knowledge of the community and the community's familiarity with the candidate met some undefined and undefinable standard. Where would that line be drawn? Would every judge draw it in the same place? .... The effect would not be the laudable and necessary goal of equal protection but rather the opposite—the ad hoc application of an arbitrary and capricious standard by the branch of government least responsive to the public at large.
>
> [*Id.* at 416 n. 15.]

The recent federal decision in *Lewis*, in respect of the state constitution's residency requirement as applied to a candidate for State Senate, unequivocally support that states can impose clear requirements that "a candidate live for a time on the right side of a boundary line," as the trial court below observed.

Finally, we note that Mosquera cannot and does not claim that the most recent reapportionment of legislative districts in any way affected her failure to live in the district for one year prior to the date of the election. Mosquera did not live in the district for one year prior to the election whether the prior or the current configuration of the Fourth Legislative District is considered in the analysis. Until December 29, 2010, Mosquera never lived in any configuration of the Fourth Legislative District. Thus, she was not a resident rendered ineligible for candidacy for office in her district as a result of the legislative reapportionment that took

effect less than one year prior to the general election. To the extent that a future as-applied challenge might arise in the immediate wake of the legislative reapportionment that must occur decennially, *see N.J. Const.*, art. IV, § 3, ¶ 1, we do not foreclose such an action for relief.

### D.

That said, the fact that a future as-applied challenge might lie does not provide a sufficient foundation for the dissent's analysis that focuses on the problems that can arise due to the decennial reapportionment of legislative districts. The dissent's entire argument on that score, questioning but never declaring New Jersey's durational residency requirement constitutional or unconstitutional on its face, builds from an assumed reapportionment impact on a candidate's eligibility for office. Several problems plague the argument.

First, that a hypothetical set of facts might call into question a state durational residency requirement is not relevant to a determination of facial constitutionality. The United States Supreme Court, even when discussing the "plainly legitimate sweep" test for constitutionality, reminded courts, when confronted with a facial challenge, to take care "not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases" under which constitutional problems might be present. *Wash. State Grange, supra,* 552 *U.S.* at 450, 128 *S.Ct.* at 1190, 170 *L.Ed.*2d at 160 (citation omitted). As the Supreme Court stated in that decision,

> [c]laims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither " 'anticipate a question of constitutional law in advance of the necessity of deciding it' " nor " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that " '[a] ruling

of unconstitutionality frustrates the intent of the elected representatives of the people.'"

[*Id.* at 450–51, 128 *S.Ct.* at 1191, 170 *L.Ed.*2d at 161 (citations omitted.)]

Although there might exist a significant issue in the context of an as-applied challenge where a candidate has been disadvantaged by reapportionment, that is not in this record. The possibility of that arising is not relevant in a facial challenge, no matter the test that is employed. *Ibid.*

Nor is it the basis of Mosquera's as-applied challenge. And, so, the dissent's introduction of a hypothetical reapportionment-caused basis for non-compliance with the one-year durational residency requirement is irrelevant to any issue raised in this case.

Not only does the dissent raise a factual issue not present in this record and not relevant to this dispute, but it then proceeds to propose a solution to a problem that is not before us. Far from "overlooking concerns" about post-reapportionment changes, as the dissent accuses, our finding that the requirement is constitutional facially and constitutional as-applied to Mosquera, is aligned four-square with how we decide cases. We do so using the standard applicable to a facial challenge and, when considering Mosquera's as-applied challenge, we consider it based on the facts before us, not on the basis of possible future facts. In respect of that, we add the following comment to the strongly worded dissent.

The dissent refers to "facts" regarding a potential reapportionment problem in order to raise the argument that the mere possibility that someone might be adversely affected calls for a striking of the durational residency requirement clause now, replacing it with *no* durational requirement. That the dissent's approach is mistaken is underscored by the very remedy it advances. Ordinarily we strain to save a statute and, perforce, of course also every part to the State Constitution. *See State v. Miller*, 170 *N.J.* 417, 433, 790 *A.*2d 144 (2002) (citing cases recognizing well-established principle that legislation will be read,

if it all possible, to sustain its constitutionality). The dissent's remedy neither squares with how this Court approaches questions of constitutionality, nor does it fit in a matter where none of the problems the dissent conjures have come to pass or are presented in this record. Respectfully, the dissent's focus is misplaced, which comes sharply into evidence with the remedy it proposes: judicial surgery, post at 85, 40 *A.*3d at 718, excising in its entirety a constitutional requirement, as a solution to a non-issue.

In closing, we reiterate that in a future as-applied challenge by someone actually affected by reapportionment, judicial surgery would be an appropriate course to consider, were the Court to first find that the durational residency requirement operated unconstitutionally in that context, but we need not address it here because this candidate cannot meet the test for someone affected by a change in the drawing of district lines due to a decennial reapportionment.

Having determined that the requirement does not violate the Equal Protection Clause, we turn to the application to be given to the holding.

## III.

### A.

In determining the effect to be given our holding on the constitutional question, we note, but briefly, that the equitable doctrine of laches initially was raised as a defense to Lovett's action challenging Mosquera's election. The defense since has been abandoned, and appropriately so.

*N.J.S.A.* 19:29–3 allows a party thirty days to contest an election. The permissible grounds for contesting an election include that "the incumbent was not eligible to the office at the time of the election." *N.J.S.A.* 19:29–1(b). Lovett's action was timely under Title 19, which leaves no room for application of a legitimate claim of laches within the statutory period allotted for bringing an action on the grounds asserted. *See Lavin v. Bd. of Educ.,* 90 *N.J.* 145,

151, 447 *A*.2d 516 (1982) (defining laches as "an equitable defense that may be interposed *in the absence of* the statute of limitations." (emphasis added)).

Moreover, it is not practical to insist that a competing candidate discover and litigate a case prior to an election in order to obtain the removal of a candidate from the ballot on disputable eligibility grounds. Equity does not support imposing such a demand, for it would result in forcing a competing candidate to expend the time and resources pursuing an investigation and litigation when such commodities are precious. And, it likely would be disruptive of the election process. In considering all the equities, it is not unreasonable for a competitor to wait until it is necessary to confront a durational residency issue. The dispute only becomes necessary if the candidate at issue has secured enough votes to succeed in the election. The Legislature demonstrated practical wisdom in allowing for an election contest on such grounds to be brought during the thirty days following the election. *See N.J.S.A.* 19:29–3.

In sum, laches has no role here. The action is timely under the statutory requirements of *N.J.S.A.* 19:29–3.

### B.

The next question to be addressed is whether our holding must, or should, be made prospective in light of *Robertson's* holding.

### 1.

██ Mosquera argues that any state court determination that Article IV, Section 1, Paragraph 2 of the State Constitution does not violate equal protection should receive only prospective application in light of *Robertson's* decade-earlier holding pronouncing otherwise. In advancing that argument, Mosquera asserts, without contradiction by Lovett, but with strenuous objection from the Attorney General, that the three-factor test for prospective application of rules set forth in *Coons v. American Honda Motor Corp. (Coons II),* 96 *N.J.* 419, 427, 476 *A.*2d 763 (1984) should apply.

For purposes of this argument we do not address the injunction entered by the federal court, but rather focus on the holding of the federal court that declared our State Constitution's durational residency requirement for General Assembly office to be in violation of the federal Equal Protection Clause.

As this Court has previously observed, the "traditional rule" is that judicial decisions are presumed to apply retroactively. *Fischer v. Canario,* 143 *N.J.* 235, 243, 670 *A.*2d 516 (1996); *Darrow v. Hanover Twp.,* 58 *N.J.* 410, 413, 278 *A.*2d 200 (1971). In *Coons II, supra,* this Court set forth a test for whether, despite that presumption, a newly announced judicial rule of law should apply retroactively in civil cases:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

[96 *N.J.* at 427, 476 *A.*2d 763 (quoting *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106–07, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 308 (1971)).]

Although Lovett addresses her argument to the *Coons II* criteria and concludes that prospective application is unwarranted, the Attorney General eschews any *Coons II* analysis, maintaining that there is no "new" rule of law but rather enforcement of a requirement "as old as this Republic."

2.

For purposes of this part of our analysis, with the issue focused on the *Robertson* holding, the argument for prospective application lacks merit. Our holding is not "new" in any sense that compels us to restrict it to future cases. First and foremost, the durational residency requirement for members of the General Assembly, as well as for members of the State Senate, has a more than 200–year history. The requirement is engrained in our

State's fundamental charter, the State Constitution. It has been included in every version of the State Constitution that New Jersey has ratified. Starting with the first Constitution of 1776, continuing in the 1844 and 1947 New Jersey Constitutions, and including passage of a 1966 amendment to the very paragraph in issue,[9] the people of this State have adopted constitutional language containing a durational residency requirement for legislative office.

Not only is the requirement longstanding and abundantly clear, it never has been questioned in our state court system. No decision of our state courts ever has held that the state constitutional durational requirement was unconstitutional or otherwise not entitled to be given full effect. Thus, in our state court system of law, there is no "new" or changed rule of law to be evaluated in terms of whether a retroactivity analysis is appropriate. *See Coons II, supra,* 96 *N.J.* at 427, 476 *A.2d* 763 (explaining that "new" rule of law either overrules past precedent or decides issue of first impression whose resolution was not readily foreshadowed).

---

[9] The 1966 amendment was occasioned by the United States Supreme Court's holding in *Reynolds v. Sims,* 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506 (1964), that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Id.* at 568, 84 *S.Ct.* at 1385, 12 *L.Ed.*2d at 531. In the wake of that decision, this Court held that the membership of the State Senate and General Assembly, which had theretofore been apportioned by county, would now have to be apportioned solely by population, and called for a Constitutional Convention to implement the necessary change. *Jackman v. Bodine,* 43 *N.J.* 453, 459-60, 476-78, 205 *A.2d* 713 (1964). In 1965, the Legislature authorized a convention to be held in 1966 for the sole purpose of "revis[ing] and amend[ing] the provisions of the present Constitution relating to the representation of the people in a Legislature, to comply with the United States Constitution." *L.* 1965, *c.* 43, § 2. The Convention proposed, and the voters ratified, an amendment that, among other things, replaced the word "county" with "district" in Article IV, Section 1, Paragraph 2, so that it read: "No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, and of the *district* for which he shall be elected one year, next before his election." (emphasis added). The Convention did not alter the fact or length of the durational residency requirement.

That a separate and parallel system of federal courts issued a ruling that reached a contrary conclusion does not make our holding "new." We have always retained the independent ability to reach our own decision on the constitutional question, subject, of course, to United States Supreme Court review. Once one recognizes that the state courts generally, and this Court specifically, have the ability to address the constitutional question before us, notwithstanding the existence of the *Robertson* decision, then it is not possible to regard our holding to be a "new" rule. As we are independently authorized to reach our own decision on the federal constitutional subject before us, we cannot and do not treat *Robertson* as a "contrary" decision. At most, it could be entitled to persuasive treatment. The seeming "conflict" is a false one when the two decisions are considered in the context of a true retroactivity/prospectivity analysis.

In sum, a traditional retroactivity versus prospectivity analysis is ill-fitted to the setting of this case. To suggest that it pertains undermines the principle that this Court retains the equal ability to render its own judgment on the federal constitutional question that has been raised and that requires our interpretation of the New Jersey Constitution that we are charged to interpret and enforce. Thus, we reject application of typical prospective versus retroactive enforcement considerations in respect of our ruling. Our holding that our longstanding state constitutional requirement that members of the General Assembly must satisfy the one-year durational requirement for eligibility is not a "new" ruling that must be limited to prospective application only.

## IV.

Having determined that our holding applies to Mosquera's election to office, we turn to the question of remedy for the filling of the vacancy created by the trial court's order declaring her election to the General Assembly null and void.

## A.

The trial court invoked the remedy provided by *N.J.S.A.* 19:27–11.2, a statutory process for filling legislative vacancies that implements the Vacancy Paragraph of Article IV, Section 4, Paragraph 1 of the State Constitution.

On December 8, 1988, after being approved by the voters a month earlier, the New Jersey Constitution was amended as follows to address vacancies occurring in the Legislature:

> Any vacancy in the Legislature occasioned otherwise than by expiration of term shall be filled by election for the unexpired term only at the next general election occurring not less than 51 days after the occurrence of the vacancy, except that no vacancy shall be filled at the general election which immediately precedes the expiration of the term in which the vacancy occurs. For the interim period pending the election and qualification of a successor to fill the vacancy, or for the remainder of the term in the case of a vacancy occurring which cannot be filled pursuant to the terms of this paragraph at a general election, the vacancy shall be filled within 35 days by the members of the county committee of the political party of which the incumbent was the nominee from the municipalities or districts or units thereof which comprise the legislative district.

> [*N.J. Const.* art. 4, § 4, ¶ 1.]

Prior to the amendment, "[a]ny vacancy in the Legislature occasioned by death, resignation or otherwise" was not necessarily filled at a general election. *N.J. Const.* art. IV, § 4, ¶ 1 (pre–1988 amendment). Instead, it was provided that "[e]ach house shall direct a writ of election to fill any vacancy in its membership but if the vacancy shall occur during a recess of the Legislature the writ may be issued by the Governor, as may be provided by law." *Ibid.*[10] Thus, the constitutional amendment eliminated the prior costly and burdensome practice of conducting special elections in order to fill vacancies.

---

[10] The 1844 Constitution treated vacancies similarly to the original 1947 Constitution, stating: "Each house shall direct writs of election for supplying vacancies, occasioned by death, resignation, or otherwise; but if vacancies occur during the recess of the legislature, the writs may be issued by the Governor, under such regulations as may be prescribed by law." *N.J. Const. of 1844*, art. IV, § 4, ¶ 1.

*N.J.S.A.* 19:27–11.1 and –11.2 also were enacted in 1988. Their adoption was made contingent on the adoption by voters of the constitutional amendment. *L.* 1988, *c.* 126, § 12. Under *N.J.S.A.* 19:27–11.1, "[w]hen any vacancy happens in the Legislature otherwise than by expiration of term, it shall be filled by election for the unexpired term only at the next general election occurring not less than 51 days after the occurrence of the vacancy." *N.J.S.A.* 19:27–11.2 governs the appointment of an interim successor. It provides:

> In the case of a vacancy occurring with respect to a member of the Senate or General Assembly who was elected as the candidate of a political party ... for the interim period pending the election and qualification of a permanent successor to fill the vacancy ... the vacancy shall be filled within 35 days by a member of the political party of which the person who vacated the office was the candidate at the time of his election thereto.
>
> [*Ibid.*]

In essence then, the Vacancy Paragraph, through its enabling legislation, makes provision for the filling of a legislative "vacancy" essentially through the appointment of an interim successor by the county committee of the party of the incumbent until an election for the unexpired term can be held at the next general election. *See ibid.*

Importantly, however, the constitutional provision defines neither "vacancy" nor "incumbent." The trial court determined that Mosquera was the incumbent whose office was vacant and ordered that the county committee of the Democratic Party—Mosquera's party—was entitled to select the interim appointee until a special election was conducted at the general election to occur in November 2012. For the reasons that follow, we agree.

We begin with the familiar canon of statutory construction that "statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." *Bedford v. Riello,* 195 *N.J.* 210, 224, 948 *A.*2d 1272 (2008). Moreover, statutory provisions "must be construed in concert with other legislative pronouncements on the same subject matter so as to give full effect to

each constituent part of an overall legislative scheme." *State v. Hodde,* 181 *N.J.* 375, 379, 858 *A.*2d 1126 (2004). Although the chapters contained in Title 19 cover various and specific aspects of election law, our duty is to construe these provisions and their use of common terminology in a sensible and harmonious way. Thus, although neither "vacancy" nor "incumbent" are defined in Chapter 27 of Title 19, we may look to other provisions of Title 19 for guidance as to their meaning.

■ The term "vacancy" is addressed most directly in *N.J.S.A.* 19:3–25, which provides:

> When a person shall remove or be removed from office because his nomination or election thereto has been declared null and void, such office shall be deemed to be vacant.

Here, the Assembly seat in the Fourth Legislative District to which Mosquera was elected is vacant under that definition because "her election thereto has been declared null and void" by our holding that she was ineligible due to her non-compliance with Article IV, Section 1, Paragraph 2 of the State Constitution.

■ Turning to the question of how to interpret the term "incumbent," we begin with the fact that this election contest was brought under *N.J.S.A.* 19:29–1(b), which allows an election challenge based on the assertion that "the incumbent was not eligible to the office at the time of the election." That language plainly regards the incumbent to be the individual who, although not eligible for the office, was actually elected. Elsewhere in *N.J.S.A.* 19:29–1, incumbent is defined as "the person whom the canvassers declare elected." Here, Mosquera was declared elected by the canvassers and Lovett has challenged her eligibility. Thus, we interpret the term "incumbent" in the Vacancy Paragraph and in *N.J.S.A.* 19:27–11.1 to apply to Mosquera in the circumstances presented here, notwithstanding that the use of the word "incumbent" in the chapter to which we have adverted covers aspects of the election process that are not precisely the same as those involved herein.

That said, the contrary interpretation advanced by Lovett—that "incumbent" should be interpreted to mean the person who held the General Assembly seat prior to the contested election—is without sound support in the law. The trial court rejected the argument, noting that the vacancy is not created by the former Assembly member's decision not to run again. Rather, the court noted that it was Mosquera's election that created the circumstance of the vacancy. The trial court's reasoning is sound. In our view, not only does Lovett's position lack foundation, it also appears to conflict with the Legislative Article of the Constitution, specifically Article IV, Section 1, Paragraph 3, which clearly states that each Legislature is constituted only for a term of two years. Although provision is made for continuous business to be continued from the first annual session of a legislative term to the second annual session, *ibid.*, that is all that is permitted to be carried over and that practice clearly conforms to the understanding that each Legislature exists only for the duration of its two year term.

The position advanced by Lovett would have the county committee of the political party of a member of the previous Legislature, revive the extinguished prior term Legislature, for purposes of appointing the interim successor pending a special election at the next general election to fill the unexpired term of a member of the new Legislature. We reject that interpretation as confounding the constitutional command that each legislative term consist of two, and only two, years. To the extent that the argument advanced by Lovett is based on the spare reasoning set forth in an earlier 1998 order of this Court in *In re Candidates to the N.J. General Assembly for the Seventh Legislative District on November 4, 1997,* 156 *N.J.* 421, 719 *A.*2d 1021 (1998), we disapprove of it. The Court's reasoning in that order failed to consider the Article IV considerations expressed herein.

Further, as the Attorney General argued, the trial court's remedy of allowing the county committee of Mosquera's political party to select the interim successor for the office will honor the

expression of popular will. The voters selected Mosquera as the second highest vote-getter for the two General Assembly seats that were to be filled through the November 8, 2011 election.

Finally, in making the selection of an interim appointee the committee should consider, among other eligibility requirements, that the one-year durational residency requirement runs from the date of the appointment, and not the date of the election. By making the date of appointment the operative one for purposes of application of the one-year durational residency requirement, our interpretation harmonizes the Vacancy Paragraph's process with other constitutional and statutory conditions for eligibility.[11]

## B.

Finally, we are mindful of the argument set forth in the amicus brief, filed by various interest groups, that our holding and remedy is inconsistent with the injunction issued in *Robertson.* Lovett contends that the amici are reformulating the argument that was advanced before the trial court; however, Mosquera did argue that the existence of the injunction entered by the federal court in *Robertson* alters the equities when considering whether to make prospective a ruling by the trial court and this Court that the durational residency requirement is constitutional.

---

[11] The dissent discounts the remedy ordered herein and thus its protest that the voters are "disenfranchised" rings hollow. First, its claim mistakenly presumes that nullification of an election on eligibility grounds "disenfranchises" the voters who voted for the ineligible candidate. If that were so, the Legislature would not have permitted post-election challenges on eligibility grounds, but it did so permit. *See N.J.S.A.* 19:29–1(b). Second, not long ago, New Jersey voters amended the Constitution to permit the filling of *any* vacancy, which includes a vacancy such as occurred here, in the manner that will unfold in the Fourth District pursuant to this opinion. The law is clear as to its operation and the people have given assent to the process of appointment of an interim successor (which can be Mosquera, if her county committee-people select her) until a special election for the unexpired term can occur in November 2012. Nothing can be further from the truth than to say that this remedy constitutes voter disenfranchisement.

We are aware that we cannot dissolve or modify the federal court injunction. The injunction entered by the federal court is directed against the Attorney General and the Secretary of State. It precludes their enforcement of the durational residency requirement found unconstitutional in *Robertson*. But it is not directed against the trial courts or against private parties such as Lovett, who certainly was as free to bring her challenge to Mosquera's eligibility on state constitutional grounds as the state courts were free to assess the constitutionality of the durational residency requirement. It also was within the trial court's power to declare Mosquera's election null and void after it concluded that the durational residency requirement was constitutional, and to order the appointment of an interim successor until a new election is conducted.

We do not ignore the injunction in our determination of the prospectivity question. We simply view its import differently than does the dissent. The *Coons II* analysis concerns a change in the law. There is none that has occurred in state jurisprudence, and the federal decision simply is not binding on our courts. That is all *Coons II* should consider. The injunction adds nothing in that analysis for it is not our law and its reach is not so broad, nor its role so vital, as the dissent contends.

The injunction, in fact, is rather narrow. It enjoins only the Attorney General and the Secretary of State, and their agents, leaving every other person—including candidates, voters, and the courts of this State—entirely free to disregard it and to continue to expect that a longstanding provision of our Constitution will be honored. How vital it has been is an open question. There certainly has not been a prior challenge, but nothing in this record suggests that anyone who was not a resident of a district for a year prior to an election, in fact, ran and was elected to office before this. The dissent's ipse dixit pronouncement that the "residency requirement, in theory and in practice, has been unconstitutional and unenforceable" is an extrapolation from the injunction. And, although it has remained in place and precludes the

Attorney General and Secretary of State from enforcing the durational residency requirement, it evidently will not prevent them from complying with the direction of this Court in this matter. The Attorney General informs us that the injunction would not prevent the Secretary of State and the Attorney General from taking the steps necessary to implement and follow the process for filling the vacancy created as a result of the trial court's order, affirmed by this Court, voiding the election results. However, that does not eliminate the concern presented by the posture of this matter.

In our view, this case cannot end here but rather must proceed further, and we must rely on the parties to pursue such necessary action. In view of the complicated situation presented by the outstanding federal injunction against the Attorney General and the Secretary of State, the parties should apply to the federal district court or file a petition for a writ of certiorari to the United States Supreme Court to resolve the lingering principled conflict that exists between our declaration of the constitutionality of Article IV, Section 1, Paragraph 2 of the New Jersey Constitution and the federal injunction, as well as the practical effects of the differing conclusions. We emphasize our awareness that our power to rule on the issue brought to us does not encompass the ability to modify or dissolve that injunction in any fashion, and we do not purport to do so here. But it is our duty to interpret and enforce our Constitution and we have done so. We leave to the federal courts what continued effect, if any, is to be given to the *Robertson* injunction and we rely on the parties to bring those questions to either of the federal forums that can resolve questions about the continuation of the injunction entered in 2002.[12]

---

[12] Although the dissent would prefer that any "clash" with the federal courts be avoided, as a practical matter a prospective limiting of our holding would promote chaos rather than minimize it because it would not ensure further review by a party adversely affected. Resolution of the conflict that cannot now be ignored would only be put off to an uncertain future time.

All that we can do, and must do, is to perform the constitutional interpretative task that has been brought to the state courts. A state constitutional requirement renders Mosquera ineligible for the high state office to which she was elected. The public interest in that requirement is a strong and long-standing one that has been retained in our Constitution ever since it first was inserted in the original constitution of this state in 1776. The voters of this state have ratified the requirement several times in the 235 years that have elapsed since it first appeared in our state's constitution. We hold that the state interests in that requirement are significant and that the requirement is reasonably and suitably tailored to advance the state's legitimate interests. It satisfies both the *Salerno* test for facial validity, and we further find that it has a plainly legitimate sweep. We therefore reject Mosquera's facial, and as-applied, challenges to the constitutional durational residency requirement for membership in the General Assembly, and we hold that the trial court properly declared her election null and void, creating a vacancy to be filled in accordance with the directions in this opinion.

### V.

The judgment and order of the trial court is affirmed.

Chief Justice RABNER, dissenting.

In this case, the majority overturns the outcome of a democratically run election conducted in accordance with a federal court order that went unchallenged for a decade. The 2001 order declared that the one-year residency requirement in the New Jersey Constitution violated the Fourteenth Amendment of the United States Constitution. The federal district court later imposed a broad injunction that barred the Attorney General and the Secretary of State from enforcing that restriction.

For about a decade since, the rules have been clear: the residency requirement has not been enforced; no candidate has been barred from running for office because of it; and no election

has been annulled on its account. In fact, candidates seeking advice from the Attorney General have been told that the one-year residency restriction does not apply.

In that context, respondent Gabriela Mosquera campaigned for a seat in the General Assembly for the Fourth Legislative District. She filed a nominating petition, and the Secretary of State certified her to run for office in the primary election. She won the primary race, and the Secretary of State certified her as a candidate for the general election. After months of campaigning, she won the race with 19,907 votes, the second highest tally. The Secretary then certified her victory. Although Mosquera had lived in the Fourth Legislative District for only ten months and one week as of Election Day, the rules in place for a decade banned application of the one-year residency requirement against her or any other candidate.

Now, after the voters have spoken, petitioner Shelley Lovett, who finished in third place, asks this Court to revisit the validity of the residency restriction. The majority reaches a result different from the federal court and concludes that the residency requirement is constitutional.

I believe that the requirement raises serious constitutional concerns during redistricting years, when a substantial number of citizens are "redistricted" out of their previous home districts. But even if the rule were constitutional, basic principles of equity and federalism require that the decision be applied prospectively in light of the unique circumstances of this case.

The majority instead mistakenly applies its conclusion to the past election. The majority not only changes the rules after the fact, it also silences 19,907 voters and strips away respondent's victory. For reasons that follow, I respectfully dissent.

I.

The residency requirement has been a part of the State's Constitutions since 1776. In the modern Constitution of 1947, the

restriction appears at Article IV, Section 1, Paragraph 2, and reads in part as follows:

> No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, *and of the district for which he shall be elected one year, next before his election.*

[ (emphasis added).]

The provision is designed to protect important interests: to prevent carpetbagging; to allow voters to become familiar with a potential candidate; and to allow the candidate adequate time to become familiar with issues important to area voters. *See Callaway v. Samson,* 193 *F.Supp.*2d 783, 787 (D.N.J.2002); *Robertson v. Bartels,* 150 *F.Supp.*2d 691, 696 (D.N.J.2001).

That said, the residency requirement raises serious questions, particularly in light of the reapportionment process. Because of the seminal one-person-one-vote decision in *Reynolds v. Sims,* 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506 (1964), New Jersey's district boundaries for State Senate and General Assembly are reviewed every ten years. *See also Jackman v. Bodine,* 43 *N.J.* 453, 205 *A.*2d 713 (1964). As part of the reapportionment process, various towns are moved to different districts to ensure an equal voice for all who possess the right to vote. As a result, voters, incumbents, and potential candidates can be moved from one district to the next once each decade.

The census is conducted at the start of the decade, most recently in 2010. After the results are final, the State's Apportionment Commission meets to redraw district boundaries. *See N.J. Const.* art. IV, § 3, ¶¶ 1–2. Because that process is not completed until early in the year of an election for State Senate and General Assembly, *see id.,* no one residing in a town that has been moved into a new district will have lived there for a full year by the time of the fall election. This past year, the Apportionment Commission completed its work in early April 2011, only about seven months before Election Day. Matt Friedman, "Redistricting Commission Approves Democratic–Proposed Legislative Map,"

*NJ.com*, (Apr. 3, 2011), http://www.nj.com/news/index.ssf/2011/04/redistricting_committee_approv.html.

United States District Judge Dickinson R. Debevoise recognized those concerns when he struck the residency requirement in 2001 in *Robertson*. He noted that "the precise boundaries" for Assembly districts "are subject to periodic revision" every ten years to "meet one-person one-vote requirements and other constitutional and statutory mandates." *Robertson, supra*, 150 *F.Supp.*2d at 697, 699. Under such circumstances, he found the reasons advanced by the State to justify a one-year residency requirement "uncompelling" and "insubstantial[ ]." *Id.* at 697. In his judgment, "[i]t requires a considerable stretch of the imagination to find that when a person moves from one district to another"—or in some cases, across the street—"it requires a year to prevent 'carpet bagging', to enable the person to become familiar with the new district and for the voters to recognize the new resident of the district." *Ibid.*

The past cycle demonstrates the real-world consequences of the redistricting process. In 2011, 190 municipalities were moved into new districts. *Compare* Robert Lupp, *Congressional and Legislative Districts For New Jersey Municipalities: An Alphabetical Listing* (2001) (identifying municipalities in each legislative district for 2001–10), *with New Jersey Legislature-Districts by Number*, http://www.njleg.state.nj.us/districts/districtnumbers.asp (last visited Feb. 8, 2012) (same for 2011–20). In addition, parts of Jersey City and Newark, which are each divided into multiple districts, were also moved into new districts. *Compare Fitzgerald's Legislative Manual* 210–11 (Skender–Strauss Assocs., ed. 2010) *with Jersey City Legislative Districts*, http://www.njelections.org/2011–legislative–districts/jersey–city–words.pdf (last visited Feb. 16, 2012); *Newark Legislative Districts*, http://www.njelections.org/2011–legislative–districts/newark–words.pdf (last visited Feb. 16, 2012). More than 2.1 million people live in the 190 localities moved into new districts by the most recent reapportionment. *See Municipalities Sorted By Alphabetical Order*, http://www.nj

elections.org/2011–legislative–districts/towns–alpha.pdf (last visited Feb. 16, 2012). Thousands more live in the redistricted areas of Jersey City and Newark.[1]

In other words, redistricting affected more than one-third of New Jersey's 566 towns. As a result, not a single adult resident in roughly one-third of the State's localities could run for the General Assembly, or vote for a neighbor who wanted to run, under the strict terms of the residency requirement. Yet none of those individuals relocated to a new area, are less familiar with the issues where they continue to live, or are less well-known to their neighbors.

The majority overlooks those concerns in finding the residency requirement constitutional. It relies in part on *United States v. Salerno*, 481 *U.S.* 739, 745, 107 *S.Ct.* 2095, 2100, 95 *L.Ed.*2d 697, 707 (1987), which stated in dicta that to prevail on a facial challenge "the challenger must establish that no set of circumstances exist under which" a statute "would be valid." *See ante* at 46–48, 40 *A.*3d at 693–95.

This Court recently relied on *Salerno* in rejecting a facial constitutional challenge to a tax statute. *Whirlpool Props., Inc. v. Dir., Div. of Taxation*, 208 *N.J.* 141, 176–77, 26 *A.*3d 446 (2011). In that case, plaintiff raised a challenge under the federal due process clause and the commerce clause, not the equal protection clause. *Id.* at 150, 26 *A.*3d 446. The Court, tracking *Salerno*, noted that a tax statute "is not facially unconstitutional if it operates constitutionally in some instances." *Id.* at 175, 26 *A.*3d 446 (internal citation and quotation marks omitted).

At the time, this Court acknowledged criticism of *Salerno*. *Id.* at 175–77, 26 *A.*3d 446. In *City of Chicago v. Morales*, 527 *U.S.* 41, 55 n. 22, 119 *S.Ct.* 1849, 1858 n. 22, 144 *L.Ed.*2d 67, 79 n. 22 (1999), for example, the United States Supreme Court noted that

---

[1] New Jersey's total population as of the most recent census was 8,791,894. U.S. Census Bureau, *New Jersey QuickFacts From the U.S. Census Bureau,* http:// quickfacts.census.gov/qfd/states/34000.html (last visited Feb. 16, 2012).

"[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself...." More recently in *United States v. Stevens,* —— *U.S.* ——, ——, 130 *S.Ct.* 1577, 1587, 176 *L.Ed.*2d 435, 446 (2010), the Supreme Court declined to decide whether *Salerno* or another standard—whether a statute lacks any "plainly legitimate sweep"—should apply to a typical facial challenge. (Quoting *Washington v. Glucksberg,* 521 *U.S.* 702, 740 n. 7, 117 *S.Ct.* 2302, 2305 n. 7, 138 *L.Ed.*2d 772, 781 n. 7 (1997) (Stevens, J., concurring in judgments)). The latter standard stems from *Broadrick v. Oklahoma,* 413 *U.S.* 601, 615, 93 *S.Ct.* 2908, 2918, 37 *L.Ed.*2d 830, 842 (1973), in which the Supreme Court explained that "where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."

Last month, the Tenth Circuit carefully reviewed Supreme Court precedents and concluded that "[t]he idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority." *Doe v. City of Albuquerque,* 667 *F.*3d 1111, 1124 (10th Cir.2012) (citing twelve cases).

*Salerno's* role in equal protection cases is even less clear. The United States Supreme Court has considered equal protection challenges without applying *Salerno, see Berkley v. United States,* 287 *F.*3d 1076, 1090 n. 14 (Fed.Cir.2002) (recognizing that "in equal protection cases involving facial challenges, the Supreme Court has thus far not discussed or applied the *Salerno* test"), and the Federal Circuit has questioned whether *Salerno* applies to an equal protection analysis, *see id.* at 1090; *see also* Stuart Buck, *Salerno vs. Chevron: What To Do About Statutory Challenges,* 55 *Admin. L. Rev.* 427, 453 n. 165 (2003) (warning that "[o]ne should be careful not to confuse the *Salerno* test ... with the level of scrutiny required under the Equal Protection Clause.... Though

the two doctrines may be coterminous to some extent—a showing that there is a rational basis for a law may well go hand in hand with a showing that the law has at least one valid application—they remain distinct doctrines with different purposes"). *But see H.B. Rowe Co. v. Tippett*, 615 *F*.3d 233, 243 (4th Cir.2010) (explaining that plaintiff alleging statute violates equal protection clause must show that there are no circumstances under which it would be constitutional); *Giusto v. INS*, 9 *F*.3d 8, 10 (2d Cir.1993) (same).

That debate aside, the scope of the residency requirement during redistricting years suggests that it might not survive intermediate scrutiny. That standard is consistent with *Matthews v. City of Atlantic City*, 84 *N.J.* 153, 417 *A*.2d 1011 (1980), and is considered at length in the majority's opinion. *See ante* at 49–55, 40 *A*.3d at 695–99.

To withstand review under intermediate scrutiny, a law must "serve important governmental objectives and must be substantially related to achievement of those objectives." *Chamber of Commerce v. New Jersey*, 89 *N.J.* 131, 158, 445 *A*.2d 353 (1982); *see also Clark v. Jeter*, 486 *U.S.* 456, 461, 108 *S.Ct.* 1910, 1914, 100 *L.Ed*.2d 465, 472 (1988); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 *F*.3d 990, 999 n. 9 (3d Cir.1993) (quoting *Miss. Univ. for Women v. Hogan*, 458 *U.S.* 718, 724, 102 *S.Ct.* 3331, 3336, 73 *L.Ed*.2d 1090, 1098 (1982)). In the context of an election law case, this Court has held that "a requirement or restriction for candidates for elective office must be *reasonably and suitably tailored* to further legitimate governmental objectives." *Matthews, supra*, 84 *N.J.* at 169, 417 *A*.2d 1011 (emphasis added).

When a law infringes on the rights of all voting-age residents in more than a third of the State's localities, for no apparent legitimate purpose, is the law's sweep too broad to be constitutional? [2]

---

[2] In the context of the First Amendment, the United States Supreme Court "recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional,

Here, can it be said that the residency requirement not only "serves important governmental objectives" but is also "substantially related" to achieving those objectives when it diminishes the voting rights of residents in 192 towns in redistricting years, even though concerns about carpetbagging do not exist? *See Chamber of Commerce, supra,* 89 *N.J.* at 158, 445 *A.*2d 353. Is such a restriction suitably tailored to achieve its aims? *See Matthews, supra,* 84 *N.J.* at 169, 417 *A.*2d 1011.

In light of the above facts, I do not agree that the residency requirement imposes "a minimal burden" on voters that is tailored to advance the State's interests. *See ante* at 60, 78, 40 *A.*3d at 702–03, 713. It is also not clear that the restriction can be saved by as-applied challenges that a quarter of the electorate could bring. *See id.* at 63–64, 40 *A.*3d at 704–05.

Because the problematic part of the residency requirement is how it is applied during redistricting years, judicial surgery might resolve the constitutional dilemma. *See Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells,* 204 *N.J.* 79, 129–30, 7 *A.*3d 720 (2010) (applying judicial surgery to eliminate constitutional and statutory provisions pertaining to recall of United States Senators but leaving laws in effect for state and local officials); *see also State v. Natale,* 184 *N.J.* 458, 485, 878 *A.*2d 724 (2005) ("When necessary, courts have engaged in judicial surgery to save an enactment that otherwise would be constitutionally doomed." (internal quotation marks omitted) (citing *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 104, 462 *A.*2d 573 (1983), and *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75, 411 *A.*2d 168 (1980))); *see also Ayotte v. Planned Parenthood of N. New England,* 546 *U.S.*

judged in relation to the statute's plainly legitimate sweep.' " *Stevens, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1587, 176 *L.Ed.*2d at 446–47 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 *U.S.* 442, 449 n. 6, 128 *S.Ct.* 1184, 1191 n. 6, 170 *L.Ed.*2d 151, 161 n. 6 (2008)). Although the overbreadth doctrine does not apply here, the sweep of the restriction bears on whether it is suitably tailored to attain its objectives.

320, 328–29, 126 *S.Ct.* 961, 967, 163 *L.Ed.*2d 812, 821 (2006) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, . . . to sever its problematic portions while leaving the remainder intact, *United States v. Booker,* 543 *U.S.* 220, 227–29, 125 *S.Ct.* 738, 160 *L.Ed.*2d 621 (2005)."). The better course might be to strike the residency requirement insofar as it applies to people who have been moved out of their home district through the reapportionment process, but otherwise leave the restriction intact.

For today's purpose, though, I believe it is not necessary to resolve those difficult questions. Indeed, differing views about the constitutionality of the residency requirement are not at the heart of this case because even if the residency requirement is constitutional, it should not apply to the past election. Equity and federalism demand otherwise.

II.

The Law Division found the residency requirement constitutional and enjoined Mosquera from taking the oath of office on January 10, 2012. The Appellate Division stayed that order in response to Mosquera's emergent application. The appellate panel believed that Mosquera had demonstrated a likelihood of success on her claim that the trial court's decision "should be given prospective effect only." I agree.

The traditional analysis for deciding whether a ruling in a civil matter should apply retroactively or prospectively turns initially on whether the decision establishes "a new principle of law." *Coons v. Am. Honda Motor Co.,* 96 *N.J.* 419, 427, 476 *A.*2d 763 (1984) (*Coons II* ) (citing *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106–07, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 306 (1971)).[3]

---

[3] Although *Chevron* has been overruled, *see Harper v. Va. Dep't of Taxation,* 509 *U.S.* 86, 97–98, 113 *S.Ct.* 2510, 2517–18, 125 *L.Ed.*2d 74, 86–87 (1993), this Court has continued to apply *Coons II. See Cox v. RKA Corp.,* 164 *N.J.* 487, 514, 753 *A.*2d 1112 (2000).

That paradigm does not entirely fit given the unique circumstances of this case. The majority's determination here is not a "new" rule in the ordinary sense because the residency requirement has been a part of the State's Constitution since 1776. Yet for nearly a decade, ever since a federal court held the restriction unconstitutional, the provision has not served as an operative rule of law. The framework in *Coons II,* therefore, is not a perfect fit, but it offers a helpful starting point in the analysis.

*Coons II* quotes the three-factor test the United States Supreme Court outlined in *Chevron:*

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history or the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."
>
> [*Ibid.* (quoting *Chevron, supra,* 404 *U.S.* at 106–07, 92 *S.Ct.* at 355, 30 *L.Ed.*2d at 306) (alterations in original).]

Starting with the first factor, *Robertson* established a principle of law upon which candidates for office could reasonably rely for a decade: that the residency requirement is unconstitutional and would not be enforced against them. The district court did not simply rule on the legal issue before it. The court instead imposed a broad injunction barring the Secretary of State and the Attorney General from enforcing the residency provision.

The majority, without a proper basis, does not consider the federal court's injunction in its *Coons II* analysis, despite the vital role that injunction has played for a decade. *See ante* at 67–68, 40 *A.*3d at 707. The injunction was not narrowly worded. Just the opposite, it addressed the two key players responsible for enforcing the State's election laws. And even now, despite the majority's ruling, the injunction remains in place. The fact that private parties could bring a state lawsuit seeking to uphold the residency

requirement did not undermine the scope or force of the injunction.

Of note, neither the Attorney General nor the Secretary of State appealed Judge Debevoise's ruling. Instead, they chose to honor it as they have done for a decade. Also, neither has tried to reopen the issue in federal court since 2002. *See Fed.R.Civ.P.* 60(b)(5) (providing grounds for relief from final judgment or order when "applying it prospectively is no longer equitable").

That the injunction has been in place for ten years also favors prospective application. The law has been so clearly entrenched that for the past ten years the Attorney General's Office "has advised people"—including candidates—that "you can be a candidate without the one-year residency restriction."

To say that the residency requirement has not been questioned in the state court system, or that *Robertson* is from a separate, parallel jurisdiction, misses the mark. *See ante* at 69–70, 40 *A.*3d at 708. Those points ignore the reality of the past decade: that the residency requirement, in theory and practice, has been unconstitutional and unenforceable.

Petitioner argues that Mosquera could have filed a declaratory judgment action before the election. But why would any reasonable person armed with a binding order from federal court litigate the very question that has already been decided in her favor?

Petitioner also maintains that there is no evidence Mosquera relied on *Robertson* when she decided to move to the District or to run for office. As discussed below, the former claim is true; Mosquera testified that she did not intend to run for office when she moved. But the latter claim is belied by the facts. Mosquera, like every candidate for General Assembly throughout the State, could reasonably rely on the state of the law after *Robertson,* and her behavior throughout her candidacy, discussed below, reveals that she did.

Because the majority's decision in effect overrules clear past precedent on which litigants could rely, the first *Coons II* factor weighs in favor of prospective application.

The second factor looks to the purpose and effect of the rule. In this case, the State's interests are to ensure that a candidate has sufficient time to be familiar with issues of concern to area residents and to allow the electorate time to become familiar with the candidate. Mosquera, of course, falls roughly seven weeks short of the one-year residency requirement, but that fact does not end the inquiry.

According to the record, Mosquera has lived in New Jersey since age three or four. She grew up in Union City and attended college at Seton Hall University and The College of New Jersey. Afterward, she lived in Hamilton, North Bergen, Deptford, and Maple Shade. She entered into a contract to purchase a home in Blackwood—a section of Gloucester Township in the Fourth Legislative District—on November 13, 2010, closed on the property on December 29, 2010, and moved in a day or two later. She registered to vote in the District on February 24, 2011 and has voted there since.

After college, she worked in Trenton for about five years in the Assembly Democratic Office, and later as director of policy for a Member of the Assembly in the Fifth Legislative District. Starting January 4, 2010, and through the date of her testimony at a hearing in this matter on December 19, 2011, she has worked in the mayor's office for Gloucester Township, within the District. The trial judge, in a comprehensive and thoughtful written opinion, found that "[t]hrough the course of her employment, she comes in contact with the residents of Gloucester Township on a daily basis, and thus is familiar with the people and issues in the Township."

The trial judge also found that Mosquera did not move to the District with the intent to run for office. Rather, she decided to run in 2011 when an incumbent chose not to seek reelection. Mosquera testified that she met with thousands of residents while

campaigning almost every weekday night and on weekends, as she knocked on doors in a majority of the district's towns, handed out literature, attended events in the community, and held two fund-raising events. She also promoted her campaign through mailers, television advertising, and telephone calls to voters.

Mosquera's two years of work in the district, her residency for more than ten months, and her campaign efforts do not raise the specter of a true carpetbagger who is unfamiliar with the election district and unknown to the voters.

The third *Coons II* factor—whether retroactive application of a decision will produce substantial inequitable results—weighs strongly in favor of applying the majority's ruling prospectively.

It is helpful to consider the events in sequence. As discussed above, from the first moment anyone contemplated running for General Assembly in 2011 through Election Day that November, the residency requirement was subject to a federal injunction that declared the prohibition unconstitutional and enjoined the Secretary of State and Attorney General from enforcing it.

Mosquera signed a nominating petition to run for office on April 11, 2011. The standard form was prepared by the New Jersey Division of Elections, which is part of the Office of the Secretary of State. Because the document was not produced at the trial court and Mosquera was not questioned about it, I rely only on certain pre-printed language. In bold print, the form lists "CANDIDATE QUALIFICATIONS" as follows:

ACCORDING TO N.J. CONST. ART. IV, SEC. 1, PAR. 2, CANDIDATE FOR THE OFFICE OF NEW JERSEY GENERAL ASSEMBLY MUST:
BE 21 YEARS OLD BY THE DAY [ ] HE/SHE IS SWORN INTO OFFICE
BE A CITIZEN AND RESIDENT OF THE STATE FOR TWO YEARS BY THE DAY OF ELECTION
BE A LEGAL VOTER BY THE DAY THE PETITION IS FILED

Consistent with *Robertson*, the list of qualifications for office makes no reference to the one-year residency requirement in the State Constitution. A reasonable interpretation of the form conveys that no such restriction applies.

Next, the Secretary of State certified Mosquera to run in the primary. She campaigned in that race and won in June 2011.

The Secretary then certified Mosquera to run in the general election. Mosquera campaigned in the manner described above and won election in November 2011 with the second-highest number of votes, 19,907. Petitioner finished in third place with 14,351 votes. The Secretary then certified the election results.

At each step of the process, Mosquera abided by the rules in place, as certified by the Secretary of State. Whether the Secretary knew that Mosquera resided in the Fourth District for less than a year or not, the Secretary was enjoined from enforcing the residency requirement.

Petitioner challenged the results of the election within thirty days, consistent with *N.J.S.A.* 19:29-3. In evaluating the equities presented, though, it is noteworthy that she did not act when she heard in June 2011 that Mosquera did not meet the residency requirement. Petitioner testified that she did not have the money or resources to bring a lawsuit then, but she also concedes that she is not paying for counsel in the present case.

The interest of the voting public also weighs heavily in favor of prospective application of the majority's ruling. This Court's case law is replete with reminders that voters have a right to choose for whom to vote on Election Day, and that their will should not be thwarted lightly. In *Gangemi v. Rosengard*, 44 *N.J.* 166, 170, 207 *A.*2d 665 (1965), Chief Justice Weintraub traced the history of the right to vote and emphasized that it "would be empty indeed if it did not include the right of choice for whom to vote." Years later in *Catania v. Haberle*, 123 *N.J.* 438, 448, 588 *A.*2d 374 (1990), Chief Justice Wilentz explained "that this Court has traditionally given a liberal interpretation to [election laws], 'liberal' in the sense of construing [them] to allow candidates to get on the ballot, to allow parties to put their candidates on the ballot, and most importantly to allow the voters a choice on Election Day." Chief Justice Warren offered similar thoughts in *Reynolds, supra,* 377 *U.S.* at 555, 84 *S.Ct.* at 1378, 12 *L.Ed.*2d at 523, when he declared

that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." The law does not preclude appropriate eligibility requirements, but they cannot be imposed after-the-fact.

19,907 voters expressed their choice on Election Day when they cast a ballot for respondent. Because the majority applies its decision retroactively, those voters will be disenfranchised. The possibility that Mosquera may be reinstated by members of her political party, under *N.J. Const.* art. IV, § 4, ¶ 1, and *N.J.S.A.* 19:27–11.2, does not change that fact. The voters did not choose party officials to select a legislator for them last November.

Balancing the equities, Mosquera followed the *applicable* rules throughout the process. She was not required to abide by a restriction that had been stricken a decade ago. Had anyone confronted her with a copy of the residency requirement mid-campaign, she could have proceeded with the knowledge that an injunction prevented the State's responsible election officers from applying the restriction to her. The authorities in fact validated her official submissions in accordance with all pending rules. And the public made its decision known at the polling booth.

When the interests of justice so require, it is proper to give this Court's rulings prospective effect only. *See N.J. Election Law Enforcement Comm'n v. Citizens to Make Mayor–Council Gov't Work,* 107 *N.J.* 380, 387, 526 *A.*2d 1069 (1987). To tell a winning candidate, whose election has been certified, that the rules have changed after the fact is inequitable to her. To annul the election is to disenfranchise 19,907 voters and raise questions about whether their constitutional right to vote has been denied. Therefore, under the unique circumstances of this case, the majority's decision cannot be applied retroactively.

## III.

There are now two competing interpretations of the residency requirement. This Court has ruled it is constitutional, yet the

federal district court's contrary decision and injunction remain in place. That is so because "a final federal court judgment based on federal law cannot be collaterally attacked by a state court." *Del. Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 *F*.2d 38, 45 (3d Cir.), *cert. denied*, 474 *U.S.* 819, 106 *S.Ct.* 67, 88 *L.Ed.*2d 54 (1985). As the Third Circuit explained in *Delaware Valley*, "there is a clearly established rule that state courts must give full faith and credit to the proceedings of federal courts." *Id.* at 43 (relying on *U.S. Const.* art. IV, § 1) (citations and internal quotation marks omitted). When a federal court renders a judgment or enters a decree under a federal statute or the United States Constitution, "that decision is 'final until reversed in an appellate court, or modified or set aside *in the court of its rendition.*'" *Id.* at 44 (citation omitted). In other words, the Secretary of State and the Attorney General are still subject to a federal injunction that bars them from enforcing the residency requirement, yet they are expected to enforce the majority's ruling as well.

The majority recognizes that untenable situation and encourages the parties to take appropriate action in federal court. *See ante* at 38, 77, 40 *A*.3d at 689, 712–13. Based on representations at oral argument, it would not be surprising if today's opinion results in an emergent filing in federal court and leaves the Fourth Legislative District seat at stake unfilled.

I believe that prospective application is compelled by the facts of this case and the applicable law. In addition, as a matter of comity and respect for a pending federal injunction, a prospective ruling would avoid an immediate, direct clash and a race to the federal courthouse. The competing decisions could have been resolved in a more orderly manner in due course—an approach that would have inured to the benefit of the voters.

## IV.

In all spheres of life, it is wrong to change the rules after the game has ended. A party who plays by the rules in place—and

wins—has earned a victory she is entitled to keep. Because today's ruling deviates from that elementary principle of fairness, I respectfully dissent.

*For reversal*—Chief Justice RABNER and Justices LONG and ALBIN—3.

*For affirmance*—Justices LaVECCHIA, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—4.